### EX PARTE M. BOGLE.

#### No. 3749. Decided November 3, 1915.

1.—City Charter and Ordinance—Jitney—Public Streets—License—Habeas
     Corpus.

Where relator was charged with violating a city ordinance of the City of
Austin for operating a jitney for hire on one of the public streets of the city
without having a license, and sought release from arrest by habeas corpus, con-
tending that said ordinance is unconstitutional, invalid and void, held, that he
must be remanded to custody, as his contention is not tenable. Davidson, Judge,
dissenting.

2.—Same—Regulation of Jitneys—Constitutional Law.

The ordinance of the City of Austin, enacted July 6, 1915, requiring that
jitney operators, for hire on the public streets of said city, must have a license
and give bond, etc., is a reasonable regulation, and is valid and constitutional.

3.—Same—City Ordinance—Jitney—Case Stated—Passengers for Hire.

Where relator was charged with operating a five-passenger Ford automobile
carrying passengers for hire in the City of Austin, as a jitney, running on a
route having definite termini of less than thirty-five blocks, which is made an
offense under section 1 of said city ordinance, enacted July 6, 1915, unless the
operator of such jitney has a license from said city, etc., enters into bond, etc.,
and the agreed statement of facts showed that he operated said jitney without
such license, and entering into bond, as provided by said ordinance, he must be
remanded to custody on habeas corpus proceedings. Davidson, Judge, dissenting.

4.—Same—City Charter—Judicial Knowledge—Jitneys—Automobiles.

The charter of the City of Austin was granted by the Legislature by the
Act approved February 3, 1909, and by a provision therein, the courts are re-
quired to take judicial knowledge thereof, and under the powers granted therein,
said city had the power and authority to enact and enforce any and all reasonable
ordinances which it deemed necessary and proper to regulate the handling of
automobiles, and the use of the streets by persons owning or operating the same,
in the carriage of passengers for hire, and under section 1 of said ordinance, a
jitney is an automobile, and is so defined by agreement in this case.

5.—Same—Discrimination—Constitutional Law—Classification.

Section 1 of said ordinance, when considered in connection with other or-
dinances, and the testimony in this case, does not violate section 3, article 1,
of the Constitution of Texas, or the Fourteenth Amendment of the Constitution
of the United States, and does not discriminate between the rights of the same
class or place a greater burden upon one than another of the same class. Fol-
lowing Ex parte Sullivan, 178 S. W. Rep., 537. Davidson, Judge, dissenting.

6.—Same—Classification—Jitneys.

The jitney, as defined in the ordinance herein attacked, and as operated by
the relator, is a class within itself, separate and distinct from both the street

car system, and other automobiles or vehicles which have stands, as described above. Following Ex parte Cardinal, 150 Pac. Rep. (Cal.), 348. Davidson, Judge, dissenting.

**7.—Same—Jitney Ordinance—Bond—Indemnity—Liability—Negligence.**

Sections 9, 10, and 11, of said ordinance, requiring a bond, nor any of the sections of said ordinance, in any way create or attempt to create in behalf of any person, any liability against the licensee, or his bondsmen, but merely provide, as one of the reasonable regulations of the licensee, that he shall provide, by such bond or indemnity, a means to satisfy the loss to such one as may be damaged by him, finally rendered by a court, and in no way prescribes any contingency under which the licensee should be liable to any person for any negligence whatever committed by him or other act by him. Davidson, Judge, dissenting.

**8.—Same—Bond—Indemnity—Reasonable Regulation.**

The bond required by said ordinance is a reasonable regulation and not void or unconstitutional on any ground. Following Green v. San Antonio, 178 S. W. Rep., 6, and other cases. Davidson, Judge, dissenting.

**9.—Same—Reason for Enacting Ordinances—Regulation of Jitneys.**

By the agreed statement of facts in this case, it appears that imperative and urgent necessity existed for the passage of said jitney ordinance, and that the jitney traffic in the City of Austin is a business done, carried on, and operated solely upon the public streets and thoroughfares of the city, and is largely confined to the paved streets and the best graded and gravelled streets; that the jitney is a new and hazardous kind of passenger traffic, etc., and that therefore the City of Austin was well authorized to pass said ordinance. Davidson, Judge, dissenting.

**10.—Same—Reasonable Regulation.**

By the agreed statement of facts in this case, it appears that where the jitney service was regulated by ordinance in other cities of Texas requiring license and bonds, that said bonds were made by indemnity companies, and it can not be assumed that said bonds could not be given under the jitney ordinance in the City of Austin, although application was made on behalf of the Austin jitneys to certain named indemnity companies without success.

**11.—Same—License Fee—Tax for Revenue—Police Regulation.**

Under section 7 of said ordinance, a license fee, respectively, of $50, $75, and $100, according to the seating capacity of the jitney, is required, but as relator comes within the $50 class only, he is not in position to attack said section of the ordinance for the amount of the latter two fees, and it being shown by the agreed statement of facts that the carrying out of said jitney ordinance will require expense for printing, clerk hire, etc., and extra police force, such license fee of $50 is in truth and in fact a license fee only, and not a tax for revenue. Following Ex parte Sullivan, supra. Davidson, Judge dissenting.

**12.—Same—Reasonable Regulation—Arbitrary Power.**

The jitney ordinance of the City of Austin, enacted July 6, 1915, under a special charter of the Legislature, by Act of February 3, 1909, is a reasonable police regulation, and is not void on the ground that it clothes the city with arbitrary power to grant or refuse a license, though the fees are paid, and all the requirements thereof complied with by an applicant for a license; besides, relator is not in a position to attack the ordinance on that ground, as he has in no way attempted to procure a license, and been refused on any ground. Following Ex parte Sullivan, supra. Davidson, Judge, dissenting.

**13.—Same—Prohibitory Ordinance—Burden.**

Where the agreed statement of facts show that the relator is a proper person to operate a jitney under said ordinance, he may reasonably comply therewith, and its provisions do not amount to a prohibition. The burden is on him to show what he claims, and not on the city.

**14.—Same—Arbitrary Power—Discouragement of Investment—Monopoly.**

Relator's contention that the arbitrary power preceding the issuance of the license, and the power reserved by the city to cancel it, discourages investment, prevents competition, and results in monopoly, is untenable, as the ordinance is a proper and reasonable regulation of the jitney business, and while some persons may experience difficulty in complying with the ordinance, such difficulty is not greater than in other like hazardous and dangerous business.

From Travis.

Original habeas corpus proceeding, asking release from arrest and detention for violating a city ordinance, regulating the operation of jitneys for hire on the public streets of the City of Austin.

The opinion states the case.

*E. T. Moore,* for relator.—The validity of every municipal ordinance depends upon two imperative and essential requisites:

1. The power to ordain and enact the particular ordinance.

2. The reasonable exercise of this power. In other words, the ordinance must within itself be reasonable and of such a character as not to carry with it such an arbitrary exercise of power as to forbid an intelligent compliance with its provisions, and not to deprive anyone of his inherent rights without safeguarding either his constitutional, statutory, or common law rights.

Under the rule of construction applicable to municipal charters the existence of powers of a legislative character must be shown by an express grant, or incidental and necessary to the proper enjoyment and exercise of such as are expressly conferred. Nothing outside or beyond this can be taken by intendment or implication. And when the ordinance which is sought to be sustained operates in restraint of an occupation or pursuit useful in its character and which is so recognized at common law and under the law of this State, it is especially necessary to show that the authority for its passage has been expressly or otherwise unequivocally conferred.

The exercise of certain police powers is an incident to every municipal corporation, whether expressly given and provided for or not; yet, if the power granting the charter of such municipal corporation limits the right, either expressly or by implication, then the incidental or implied power which might otherwise arise must give way and be controlled and limited by the express declaration.

Keeping in mind the fundamental principles suggested, I respectfully direct attention to the provisions of the charter of the City of Austin which I have copied in the foregoing part of this brief as bearing upon the question under discussion.

Section 10, article 14, of the charter confers upon the City of Austin

the power "to license and regulate hacks, carriages, omnibuses, wagons, and drays; and to fix the rate to be charged for the carriage of persons and for the wagonage and cartage and drayage of property."

It will be observed that automobiles *eo nomine* are not mentioned by this section, nor is there in any other article or section of the charter the power expressly given to license automobiles as such.

Section 33 of article 14 has no reference whatever to the granting of licenses. It refers simply to the regulation of speed and the proper handling of automobiles. As section 33 is a part of article 14, and refers to regulating the *speed of automobiles,* and as automobiles were in full use by the public at the time the Legislature granted the charter to the City of Austin and adopted section 10 as a part of article 14, and by that section authorized the City of Austin "to license and regulate" the other named vehicles, it is quite probable, if not plainly evident, that the Legislature intended to confer the power by section 10 to license and regulate automobiles as they had the other named vehicles and that they should come within the meaning and same class of the other vehicles named. The Legislature gave the power as named or else it was not given at all. If given as named, then the automobile was classed with the other vehicles. The Legislature having seen proper to thus classify vehicles, such classification is binding upon the city by reason of that provision in the Constitution which says: "That no charter shall contain any provision inconsistent with the Constitution of the State or the general laws enacted by the Legislature of the State."

If the Legislature did not intend to include the automobile in section 10, article 14, and classify it with the other vehicles mentioned in said section, then it intended to leave it out and exclude it from license and regulation.

It is by virtue of this section alone that the city can exercise any power or right whatever to license vehicles carrying and transporting passengers and freight. Power is granted in many instances by article 14 of the charter to license and regulate other matters of business, calling or trade, but no other section of article 14 confers any power upon the city to license vehicles. Article 14, therefore, contains not only the grant of power to license, but is also a limitation of power and excludes by construction the right or power to include anything not mentioned or included therein. In other words, the right to exercise this particular kind of police power, in instances, is not only expressly provided for by the charter, but carries with it the manner, method and way of its execution, leaving the details as to its exercise with the city council.

The expressly conferring of this police power by the charter is a limitation against the exercise of its particular power as to the license and other matters not mentioned, and no implication or intendment can arise against or to enlarge the power granted upon the well-known legal principle that the enumeration of these powers as to the particular subjects carries with it the exclusion of all others.

Section 3, article 1 (Bill of Rights) of the State Constitution says:

"All free men, when they form a social compact have equal rights, and no man, or set of men, is entitled to exclusive separate public emoluments, or privileges, but in consideration of public services."

So sacred is this right of equality regarded, the people of the United States were not willing to trust alone to the different States the power or option to protect this right, either by their Constitutions or statutes, but by the Fourteenth Amendment to the Constitution of the United States they forever placed it beyond the power of any State or any of its subdivisions or departments to enact any law injuring or destroying this equality. It provides that "No State shall make or enforce any law which shall abridge the privileges or immunities of the citizens of the United States." This is not only a guarantee of all inherent rights and privileges of individuals, but is an express inhibition of the exercise by the States of any power seeking to or in effect impairing or destroying this right. Wherever an individual has a right either at common law or under the statute, or an inherent right independent thereof, and that class or character of right is common to all individuals alike, then any Act of the Legislature of the State or any of its subdivisions seeking to impair or take away the right of a particular individual, and at the same time permitting the same class of individuals to enjoy the right to the exclusion of the particular individual, is violative of this article of the Constitution.

The members of the public have a right to use public avenues, such as streets and roads, for the purpose of travel and the transportation of property, when used and exercised in the ordinary course of such travel and business. This right is common to all. It is admitted that the power exists to regulate this right and to prescribe rules for the exercise thereof. But such power must be so used as not to abridge a privilege or confer a right upon an individual or set of individuals to the exclusion of other individuals or things of the same class.

Both by common law and statute all vehicles for the carriage of persons or the transportation of property when used and operated in the ordinary and regular course of said travel have equal rights to use the public roads or streets. The courts have repeatedly held that automobiles are within this rule and have the same rights to such roads and streets as any other vehicle. Nor are automobiles to be considered *per se* as dangerous machines. The danger, if any, may arise from the manner of its driving, as does the danger of any other vehicle. The following cases are submitted as decisive of this question: Sineone v. Lindsey, 65 Atl. Rep., 778 (Del.); Wright v. Crane, 106 N. W. Rep., 71 (Mich.); Hannigan v. Wright, 63 Atl. Rep., 234; Indiana Spring Co. v. Brown, 165 Ind., 465; Shinkle v. McCullough, 116 Ky., 960; Hall v. Compton, 130 Mo. App., 675; Towle v. Marrett, 3 Maine, 22; McFern v. Gardner, 121 Mo. App., 1; Hennessy v. Taylor, 189 Mass., 583.

The first section of the ordinance in question, after defining the term "jitney" to mean and "include any automobile or motor vehicle, except such motor vehicle as may run upon a fixed track or rails, engaged in the limits of the City of Austin in the business of carrying passengers

between two definite termini stations," etc., provides that "all motor vehicles used as sight-seeing cars, hotel buses, livery automobiles, taxicabs, or for like purpose and which have regular stands or places of business, and which are operated for hire by the hour, day or trip, and which do not commonly travel the streets for the purpose of procuring passengers indiscriminately, are not included in the term 'jitney' and are excepted from the operation of this ordinance."

The city council, by the creation of a word, which it had no right to create and apply to applicant, and by the definition of a word which it had no right to define, nor force upon citizens already in the business of carrying passengers in automobiles, by taking the same identical automobile from the midst of the class of vehicles with which it had and was then running and doing business, attempts, by merely naming the automobile a 'jitney,' to thus create a particular class of vehicles in contravention of the classification described by the Act of the Legislature granting the charter. An automobile is none the less an automobile or a vehicle of that class simply because the city council has given to it some other name. Its rights can neither be impaired nor destroyed by such legislative legerdemain, if it was one of the class of vehicles intended by section 10, article 14, of the charter subject to be licensed.

It is within the power of the city council to regulate its use in carrying passengers and to require a license for such use; but it had no power to discriminate against it by denying it equal rights with other vehicles of the same class—that is, other vehicles carrying passengers for hire. In other words, the ordinance singles out a particular automobile, calls it by some other name, places upon it heavy burdens that are not placed upon other automobiles carrying passengers for hire, and denominates it a class. This is clearly an evasion of the law, and beyond the powers, either express or implied, conferred by the city charter. It is in violation of section 3, article 1, of the State Constitution and of the Fourteenth Amendment of the Constitution of the United States.

By an examination of other sections of the charter which must be read into this section by construction, it will be seen that this particular automobile must have a fixed starting point and a fixed place to stop, not less than thirty-five blocks from its starting point. It is required to pay from fifty to one hundred dollars, according to its seating capacity, to take out a license, not to travel upon the streets of the City of Austin, but upon some particular street or streets prescribed by the permit, and for this privilege it can not charge exceeding five cents per passenger; while other vehicles, including other automobiles, pay comparatively no license fee and charge comparatively large sums for carrying passengers a much shorter distance than the distance prescribed for this particular automobile. Surely no court will hesitate to hold that this is a discrimination. Pullman Co. v State of Texas, 64 Texas, 274; Ex parte Jones, 38 Texas Crim. Rep, 482.

The above sections (sections 9, 10 and 11) of the ordinance are beyond the powers of the city government to enact, as the city charter

confers no right, either expressly or by implication, to create a cause of action in behalf of individuals, strangers to the licensee or licensor; or to provide a remedy for such, or to insure or indemnify the city against damage or loss, unless such damage or loss is of such a nature as to render the city liable either by statutory or common law, and by the terms of the ordinance and the conditions of the required bond it affirmatively appears that the damage or loss sought to be guarded against is not of this character. The express power to require the bond nowhere appears in the charter, and if such power exists at all it must arise by implication and in aid of the power to regulate and license under section 10, article 14, of the charter. Implications of this character are not favored in construction by the courts, and to be such it must appear beyond question that the power is absolutely necessary to aid in the power expressly granted. The power to regulate and license doubtless carries with it the implied power to require a proper and reasonable bond payable to the licensor for the faithful performance of the obligation assumed by the licensee, but this implication can extend no further. The city has no power to create causes of action in behalf of individuals who are strangers to the licensee or licensor, or to provide a remedy for such, which the obligations and conditions of the required bond seek to do by this ordinance. It is certain that no such express power was given in the charter, and it is equally certain that no such power can arise by implication.

It is not contended that the State, through its legislative department of government, may not create causes of action and provide remedies. This power exists in the Legislature by reason of its general legislative power, and it is only restrained or prohibited by some constitutional provision. It can do this because of its expressly delegated powers by the people through the organic governmental system creating the three different departments of government. Not so with the city council. Its legislative power emanates from the Legislature of the State, and it must be given in such words as *expressly authorize* the thing done, or by the use of words that *necessarily imply* the very thing done.

Besides, the city can not be held in damages for any injury when acting in its governmental capacity, and she had no right to burden her citizens by requiring an unnecessary obligation before engaging in a lawful pursuit. McFadin v. City of San Antonio, 54 S. W. Rep., 48, and cases cited.

It is only when it acts in its corporate capacity, as contradistinguished from its governmental capacity, can the city be held at all for any personal injury, and then only for such injuries as do not result in death. Galveston v. Posnainsky, 62 Texas, 118; Elliott v. Brownwood (recently decided by the Supreme Court).

In an opinion rendered by Judge Stayton, in Taylor v. Dunn, 80 Texas, 652, the Supreme Court of Texas held that the City of Austin (a case arising under a former charter of the city) had no power to require the kind of bond provided for by the ordinance now under consideration, and could not make a contract solely for the purpose of con-

ferring on individuals a cause of action they would not otherwise have. Callan v. Wilson, 127 U. S., 540; Chy Lung v. Freeman, 92 U. S., 275; Henderson v. Mayor of N. Y., 92 U. S., 259; Commission of Emigration v. North German Lloyd, 92 U. S., 259; Passenger Cases, 7 How., 283; N. Y. v. Milan, 11 Pet., 102; Jew Ho v. Williams, 103 Fed. Rep., 10; Wong Wai v. Williams, 103 Fed. Rep., 1; Connolly v. Union Sewer Pipe Co., 184 U. S., 540.

It is a question for this court, under all the facts and circumstances: Were the sums provided for by section 7 license fees or levied for revenue purposes? Did the city council at the time undertake to discriminate and set apart for distinctive purposes the money derived from this source? Or did they merely determine the amount they thought proper to charge and expect the income thus derived to defray that much of the expenses of the city? Did the council have in mind just the quality of intent and purpose that distinguished between the act permitted and the act prohibited? Did they think or care as to the designation or purpose of the fund when derived? Of course, the court understands that element in human nature that defends when assailed and will not be surprised that the city does not concur in but denies our position.

The applicant asserts that the large fees charged for the privilege of running his own car upon the streets of his home town, towit, from $50 to $100, was intended, among other things designed, as a revenue producer to aid in paying the expenses of the city. He says that the council meant to levy, in effect, a charge against the occupation of running a jitney, and that they had no authority under the laws and Constitution of Texas so to do.

Section 1, article 8, of the State Constitution limits the powers of the city to one-half of the tax levied by the State, and as the State is not levying any occupation tax upon vehicles none can be levied by the city.

There were 2495 automobiles permitted to run in the County of Travis, and 1800 of that number in the City of Austin. By what kind of process did the council ascertain that $50 or $75 or $100 was the proper proportionate charge against the jitney and nothing (practically) against the others?

The additional clerical force and cost of blanks would have required but a nominal sum, easily met by the same license fee of two dollars charged against other automobiles. The fifty, seventy-five and hundred-dollar fees were unauthorized and unjustified. The fact that extra policemen are necessary is not to be considered as an item in granting the license. This matter of providing and employing policemen is in the exercise of a purely governmental power and carries with it the exercise of the city's taxing power to provide for the pay of such officers; and this regardless of fixing or collection of license fees.

The following authorities are submitted as decisive of these questions: Waters-Pierce Oil Co. v. Hot Springs, 109 S. W. Rep., 293; Taylor v. Pine Bluff, 34 Ark., 603; Jackson v. Newman, 59 Miss., 385; Mulkay

v. Newark, 57 New Jersey Law, 513; Memphis v. American Ex. Co., 102 Tenn., 336; Kiowa v. Dunn, 21 Colo., 185; Cooley on Taxation, p. 1138-1140; Saginaw v. Saginaw Civ. Judge, 106 Mich., 32; Ellis v. Frazier, 38 Ore., 462.

"The ordinance as a whole is unreasonable, as it clothes the city with arbitrary power to grant or refuse a license, though the fees are paid and all the requirements are complied with by the applicant for license."

The fifth section of the ordinance provides that "the city council may grant such application as filed, or may modify and *grant* the same as modified in *its* discretion."

This is clearly the reservation of arbitrary power in the city council. Under this section, though the applicant complies in every respect with the requirements of the ordinance, though his automobile is perfect in all of its parts, though he offers a perfectly solvent bond, his application may be rejected or modified without his consent or agreement.

It is submitted that the following authorities hold this ordinance to be void by reason of the arbitrary powers reserved to the city: Yick Wo v. Hopkins, 118 U. S., 356, and authorities cited.

In conclusion, applicant reiterates the fifth and sixth reasons assigned for declaring the ordinance void.

5. Because the difficulty of complying with the requirements of the ordinance practically amounts to a prohibition. The amount of the fees, the conditions to be complied with before a bond can be given, the terms of the bond, and the amount of the bond, are requirements which can not be complied with.

6. Because the arbitrary power preceding the issuance of the license and the power reserved by the city to cancel the license and throw the licensee out of business at any time tends to and does prevent competition, discourages the investment necessary to go into business, and results in building up a monopoly in behalf of the street car company.

*C. C. McDonald,* Assistant Attorney General, *J. Bouldin Rector, H. B. Barnhart,* and *E. C. Gaines,* for respondent:—The city has a right in the exercise of its police powers to subject common carriers of passengers on its streets and highways to such responsible requirements as may be necessary for the conservation for the public safety and the protection of the public, and a requirement of a bond to protect persons and property using its streets against loss in case of damage caused by such common carriers is clearly in the power of the city to enforce police powers. Ex parte Sullivan, 178 S. W. Rep., 537; Barrett v. City of New York, 183 Fed. Rep., 793; same case, 189 Fed. Rep., 268; State v. Foster, 46 Atl. Rep. (R. I.), 833; Gondling v. City of Chicago, 52 N. E. Rep. (Ill.), 44; same case, 177 U. S., 183.

The license fee prescribed in the ordinance is not an occupation tax, and are upheld as a valid exercise of a police power. State v. Foster, 46 Atl. Rep. (R. I.), 833; City of Fort Smith v. Scruggs, 69 S. W.

Rep., 679; City of Des Moines v. Bolton, 102 N. W. Rep. (Iowa), 1045; City of Newport v. Mukle Bros., 161 S. W. Rep. (Ky.), 549; Ex parte Gregory, 20 Texas Crim. App., 210; Ex parte Slaren, 3 Texas Crim. App., 662; Ex parte Denny, 129 S. W. Rep., 1115; Ex parte Cramer, 136 S. W. Rep., 61; Brown v. Galveston, 97 Texas, 1; Village of Minnesota v. Martin, 145 N. W. Rep. (Minn.), 383; City of Henderson v. Lockett, 163 S. W. Rep. (Ky.), 199; City of Mankato v. Fowler, 20 N. W. Rep., 361; Cooley on Taxation, p. 587; Ex parte Sullivan, supra, 178 S. W. Rep., 537.

A license fee as prescribed in the ordinance is upheld even though it produces revenue because the use of the streets tends to their detriment and compels the city to expend a large sum on their upkeep, and a provision that the excess shall be applied to the maintenance of the street is valid. Brown v. City of Mobile, 23 So. Rep. (Ala.), 233; City of Ft. Smith v. Scruggs, 69 S. W. Rep. (Ark.), 679; City of Des Moines v. Bolton, 102 N. W. Rep. (Iowa), 1045; Barnett v. State, 12 N. E. Rep., 463; Jackson v. Neff, 60 So. Rep. (Fla.), 350; Dillon on Municipal Corporations, secs. 1166, 714, 661, 662; Elliott on Roads and Streets, secs. 544, 1112-1114.

The reserving of the right to say who should and who should not have permits by the city is not discriminatory nor is it unjust, and should be upheld. Kissinger v. Hay, 113 S. W. Rep., 1005; Ex parte Sullivan, supra.

Cities have a right to make classifications and discriminations. Kissinger v. Hay, 113 S. W. Rep., 1005; Wisher v. St. Louis, 194 U. S., 361; Davis v. Mass., 167 U. S., 43; Wilson v. Eureka City, 173 U. S., 32; Ex parte Sullivan, 178 S. W. Rep., 537; Ex parte Calif, 150 Pac. Rep., 348; Iowa Co. v. Sopia, 39 Iowa, 112; Morris v. Stout, 78 N. W. Rep., 843; Minnesota v. Robinson, 43 N. W. Rep., 833; Commonwealth v. Kingsbury, 85 N. E. Rep., 848; Commonwealth v. Boyd, 74 N. E. Rep., 255; Christy v. Elliott, 74 N. E. Rep., 1035; People v. Snyder, 139 Mich., 673; People v. McWilliams, 86 N. Y. Supp., 357; Commonwealth v. Stoder, 2nd Cush., 562.

The Legislature under its police power may prescribe that automobiles shall not pass over certain streets or public ways in a city and the power can be delegated to a city council. Brodbine v. Revere, 66 N. E. Rep., 607; Com. v. Crowninshield Case, 72 N. E. Rep., 963; Nelson v. Board of Health, 71 N. E. Rep., 693; Com. v. Sisson Case, 75 N. E. Rep., 619; Com. v. Mulhall Case, 39 N. E. Rep., 183.

The right to use a street is at all times subject to governmental control and there is no vested inalienable right to use it without restraint, and that it is a reasonable restraint to regulate it, and that excluding automobiles from the street does not violate inalienable or vested right. State v. Phillips, 107 Maine, 249, 78 Atl. Rep., 283; State v. Mayo, 75 Atl. Rep., 295; Commonwealth v. Abrahams, 30 N. E. Rep., 79; Christy v. Elliott, 74 N. E. Rep., 1035; Ex parte Berry, 89 Pac. Rep., 44.

*E. C. Gaines,* for respondent.—In considering the validity of a municipal ordinance when attacked from the standpoint of its constitutionality and the proper exercise of the police powers, there are certain well-known and well-defined fundamental principles that must be kept in mind.    Such of these as may be appealed to in opposition to such ordinances are very ably and accurately set out in the dissenting opinion in the Sullivan case, 178 S. W. Rep., 537.    Let it suffice to say that what is written here is in the full spirit and appreciation of those well-known elementary principles.

It is contended that the ordinance is invalid because it violates the Fourteenth Amendment to the Constitution of the United States and section 3 of article 1 of the Constitution of Texas, in that it denies to all persons the equal protection of the laws and grants exclusive privileges, or in other words, discriminates.

These objections have been almost uniformly urged in cases in this country where the exercise of police powers have been resisted.    The objection that such legislation by a State or municipality violates the Fourteenth Amendment can rarely ever be tenable.    It seems to have escaped those urging this proposition that, the police power, having been left unimpaired to the States, the question of its conflict with the Fourteenth Amendment or other Federal authority, except as touching interstate commerce, can never properly and logically arise, because if the Act exceeds the proper domain of police powers, it is void for that reason without reference to its violation of any Federal inhibition, and if it does not exceed the ordinary and proper domain of police powers, it can rarely ever trespass upon the domain of Federal authority.    In other words any legislation under police powers that denies to all persons equal protection of the laws is void primarily, not because it violates the Fourteenth Amendment, but because it exceeds the fundamental limitations of police powers, and would be and was equally void before the Constitution of the United States ever existed.    The term invoked was intended to cover a broader field than police powers and is incidentally declaratory of the already existing law in so far as it refers to police powers.    Cooley's Constitutional Limitations, p. 709; License Cases, 5 How., 504; Passenger Cases, 7 How., 283; Slaughter House Cases, 15 Wall., 36.    It might well be observed that the same observations would apply to the clause of the State Constitution referred to for by the common law of England, adopted in this State before the above provision was placed in the Constitution of 1845 as preserved in all subsequent constitutions, discrimination and exclusive privileges were adjudged to exceed the proper limits of the police powers, because this principle of right antedates even Magna Charta.    But the discussion of this proposition by the courts of this country have usually had reference to the constitutional provisions of the States, presumably because it is easier to interpret the Constitution than to search the common law for those well-defined precedents that are held to be in derogation of common right.    But a too restricted interpretation of the police powers, however, often arises from a misconception of their origin

and nature. This power does not grow out of or exist by virtue of any constitutional grant or provision. It inheres in the ultimate sovereign and springs from and rests upon the same foundation as constitutions. It is the breath of the sovereign, based upon the maxims that "the safety of the people is the supreme law" and that "no one may so use his own as to harm another," and in its exercise the people, the ultimate sovereign, in our form of government, acting through their Legislatures, may exercise any power not in derogation of common right, unless expressly prohibited by the Constitution of this State. Of course, in the exercise of this power the Legislature or municipality must not discriminate.

It is contended that the ordinance involves a discrimination because it does not impose a like burden or license on all vehicles carrying passengers for hire and because it allows some of these certain privileges not allowed to others. The facts show that hacks having designated stands and making special trips, as well as cars belonging to individuals, are not subject to the regulations imposed on the "jitneys." The facts also show that the street railway company is not subject to the license or the bond required by the "jitney," but it appears that there are other burdens imposed on the street railway for using practically the same privileges the jitneys use that are much heavier than those imposed on the jitneys. It pays an occupation tax, an ad valorem tax and an annual paving account estimated at about $30,000, and has spent on paving streets of Austin more than $300,000, and is required to pave and keep in repair all that portion of the street between its rails, and for one foot on either side. It appears that its annual tax per passenger seat is $58.76, whereas, if this tax were imposed on the jitney of even a five-passenger car it would be more than five times the license required of it by the ordinance. Besides the space on the thoroughfares occupied and in various respects the servitude on the streets appears to be much greater in proportion to the passengers carried by the jitney than by the street cars. So that it would seem that as between the street cars and the jitneys this ordinance rather discriminates in favor of the jitneys. As between the jitneys and other classes of vehicles, the facts show that they do not belong to the same class of carriers. The others are but a limited servitude on the streets, have stands and make special trips only. If they undertake to go along the streets and receive and discharge passengers indiscriminately, they at once cease to be as they were and come under the operation of the jitney ordinance. The jitney is not required to have any stand or to cease moving, but may on a route to be selected by it travel continuously and receive and discharge passengers at all times. It is in law as it is declared to be in said ordinance, a common carrier, and belongs to a class entirely different and distinct from that of any of the other classes of vehicles inveighed against. The fact that it carries on its business in automobiles and that they carry on their business in automobiles only shows one point of resemblance, and leaves them as far from falling under a common definition or class as "Plato's Man." Other phases of alleged discrim-

ination are pointed out such as the graduated license fee, requiring a bond and the reserved right in the council to decline to grant a license over a particular route. As to the graduated license fee that could be no discrimination against relator, as held in the Sullivan case, because the car operated by him would only be subject to the minimum license fee. The matter of the bond will be discussed presently; but the reserved right in the council to decline to grant a license over a route if they thought best to not do so is but a reasonable and proper exercise of their police powers. In construing such reservations the law will always allow that it must be in the exercise of a sound discretion and its abuse is always subject to review. State v. Yopp, 97 N. C., 477.

But it is urged that this ordinance discriminates between automobiles carrying passengers for hire. As observed before, the fact that passenger traffic is done by automobile by no means carries the conclusion that they all fall within the same class. It is simply the machine and is subject to a variety of uses, some of which are manifestly more of an evil, inconvenience or increased servitude on the streets than others. It is certainly not the same class of traffic to carry passengers for hire from the depot to a hotel only, or on special trips only, or to leave a stand or depot in the city for regular runs between that and other towns or cities as auto-interurbans, as it is to dart continually over the principal streets of a city, returning there every few minutes and from the very nature of the traffic to congest traffic and endanger travelers in the very heart of the cities. It has always been held that the classification may be made according to the evil intended to remedy and that much indulgence is allowed in construing such acts out of deference to those who deal directly with the immediate conditions. Dillon on Municipal Corporations (5 ed.), sec. 714. Here Mr. Dillon observes that "the high speed at which automobiles may be operated, and the peculiar dangers attending their use justifies the Legislature in legislating for them as a distinct class." There is neither force nor logic in the assertion that because the Legislature in the charter of the City of Austin has authorized it to license "carriages" this is such a legislative classification that the same license and regulations must be imposed on all carriages alike without regard to the manner of their use. The same charter authorizes the licensing of merchants, but no court would deny the power of the council to impose one license on a wholesale and another on a retail merchant or to otherwise classify merchants according to facts and conditions. But the power to license does not necessarily find its source in that clause of the charter. The charter provides that "the city shall have exclusive control over and regulation of all streets, alleys, sidewalks, and highways and public squares within the corporate limits of the city and shall have power . . . (h) to regulate the use of the same." It is from this provision of the charter that the broader and more ample powers are derived. Such provisions are common to the charters of the "free cities" of the different States and have received quite a uniform construction in harmony with the courts of our own State. It is

generally held that "exclusive control" and power to "regulate the use" of streets confers the power to license as well as to fix rates, or fares, but the latter power is expressly given in the Austin charter. Ex parte Denny, 59 Texas Crim. Rep., 579; Ex parte Gregory, 20 Texas Crim. App., 210; Brown v. Galveston, 97 Texas, 1; Scudder v. Henshaw, 134 Ind., 56; Commonwealth v. Gage, 114 Mass., 328; Fonsler v. Atlantic City, 70 N. J. L., 125; Tomlinson v. Indianapolis, 144 Ind., 142; People v. Schneider, 139 Mich., 673; Pevy v. Goss, 90 Texas, 89; Dillon on Municipal Corp. (5th ed.), sec. 1166. Our own decisions have also fully established the principle that the power to license carries the power to properly classify and that in doing this the city may classify classes. The recent case of Ex parte Sullivan, 178 S. W. Rep., 537, goes very fully into that proposition, and quotes from the recent case of Southwestern v. Dallas, 174 S. W. Rep., 636, a case very aptly in point; and the temptation to quote from such authorities is only denied by the fact that almost every part of them is so cogent to this discussion nothing less than a quotation of the entire opinions would seem to exhaust the language exactly in point. Indeed, the Sullivan case above is in itself a decision on all the issues in this case. The earlier cases, while not dealing with a form of passenger traffic that required as high a license, have sustained the principle involved quite as fully as these later ones. In the cases of Ex parte Gregory, 20 Texas Crim. App., 210, and Brown v. Galveston, 97 Texas, 1, the first by the "old court" and the second by the Supreme Court, the license fees were graduated from $2.50 to $12, and the subjects classified much more arbitrarily than here, but they were held to be fairly within the police powers of the city. Nor is the ordinance affected by the fact that street cars and certain other vehicles are excepted from its operation. Kersey v. Terre Haute, 161 Ind., 471; Southwestern Tel. Co. v. Dallas, 174 S. W. Rep., 636.

It is next contended that the city has no power to require a bond such as the ordinance provides for. It is urged that only in the event the city would be liable for any injury by the jitneys and only to that extent could the city require a bond to indemnify itself and that the city can not require the bond because it would in no event be liable. There is some respectable authority tending to deny the liability of the city in such cases, but the weight of modern authority is that when a city having control of the streets and charged with the public trust of regulating their use permits a hazardous traffic thereon from which a person is injured the city would be liable. This was gone into and authorities cited in Ex parte Sullivan, 178 S. W. Rep., 537. But independent of its own liability the city has a right and is charged with the duty to require proper indemnity to the public. The highways, including the streets, are primarily under the control of the State and by language such as we have copied from the Austin charter this control is completely delegated to the city. It thereby became charged with a public trust in the streets, not only to keep them in repair but to so regulate their use that travel by the general public will not be

fraught with a continual menace to life and limb. It is by reason of this trust and duty that a city has power to require a bond as a part of the plan of regulation. In Peavy v. Goss, 90 Texas, 89, the precise question was decided in principle, as was pointed out in the Sullivan case. The title of the Act was to "regulate" the sale of spirituous liquors, and the body of the Act required a bond. The objection was that the bond was not germane to the matter of regulation named in the title, but the court held that the power to regulate carried the power to require a bond. Again, in the case of Ex parte Bell, 24 Texas Crim. App., 428, Judge White, of the "old court," held squarely that the police power of the Legislature to regulate the liquor traffic carried the power to require the onerous bond provided for in that law. Indeed, the upholding of this right to require a liquor dealer's bond, the soundness of which no one will deny at this day, completely destroys all argument against the right of a city, regulating the use of streets to do the same under its police power. As showing how nearly the same principle applies, it is said in the Bell case, "such regulations are usually made for the cases of hackmen, saloon keepers, proprietors of billiard halls, theaters, shows, etc." Now, if in regulating "hackmen" a bond may be required, then by a stronger reason it may in regulating a "jitney." In the cases of Brown and Gregory, already cited, a bond was required, and while this issue is not discussed, its omission is significant of the common opinion of the bench and bar on the issue. But any extended discussion of the subject is unnecessary in view of the holding of this court in the Sullivan case that a bond very similar though not quite as liberal was within the public powers of the city. The soundness of this view is further assured by the unanimous opinion of all the six judges of the Supreme Court of California in the recent case of Ex parte Cardinal, 150 Pac. Rep., 348. This was a jitney case, and, like the Sullivan case, is decisive of the issues in this case. It will be seen that the bond required by the City of San Francisco was substantially the same as this bond in terms, but for $10,000 in amount and in an able and lengthy discussion the power of the city is completely sustained. The case of Taylor v. Dunn, 80 Texas, 652, relied on by relator, does not deny, but expressly recognizes, the right to require a bond. The distinction in that case being because the ordinance under which the bond was given prescribed as its only condition the removal of the debris, whereas the defendant was sought to be held on the bond for a personal injury in nowise connected with a breach by failure to remove the debris. If the ordinance in that case had required the conditions that were inserted in the bond, the defendant would have undoubtedly been held liable. A very clear analysis of this case is made by Judge Fly in Green v. San Antonio, 178 S. W. Rep., 6, involving the jitney ordinance of that city, where the right to require the bond was also sustained in a very clear and able opinion. The proposition urged by relator that a city has no power to create a cause of action does not enter into the question. The city does not undertake to in any way increase or diminish what would otherwise

be the legal liability of any owner or operator of a jitney. It simply, as in duty bound, requires a very reasonable indemnity whereby the amount of this liability, otherwise existing and determined, may be realized. It may be added that the failure to require a like bond of the service cars and the street railway is no discrimination. As already pointed out, the service car belongs to a different class where the hazard is small, and the street railway has tangible properties subject to execution amounting to hundreds of thousands of dollars whereby one person injured may have ample satisfaction.

It is further urged that the ordinance grants a franchise and is void, because the charter requires that no franchise be granted except by a vote of the people. Such privileges are sometimes regarded as a franchise in common parlance, but a franchise in a legal sense is quite a different privilege, having more of the elements of stability and permanence. Here the jitney operator may select a different route at will, with the approval of the council; and the other rights and privileges are more precarious and subject to change or modification than are necessary to constitute a franchise. The distinction is nowhere more clearly drawn than by Chief Justice Sanborn in McPhee & M. Co. v. Union Pacific Ry. Co., 158 Fed. Rep., 5, where he says: "A right or privilege which is essential to the performance of the general function or purpose of and which is and can be granted by the sovereignty alone, such as the right or privilege of a corporation to operate on ordinary or commercial railroad, a street railroad, city waterworks or gas works and to collect tolls therefor is a franchise. A right or privilege not essential to the general function or purpose of the grantee and of such a nature that a private party might grant a like right or privilege upon his property or revocable permission to occupy or use a portion of some public ground or highway, or street, is a license and not a franchise."

But it is contended that the license fees exacted by the ordinance is a tax under the guise of a license and void because the city has no power to levy an occupation tax. The test in such cases is the relation the probable license fees would bear to the increased expense of policing and the increased servitude on the streets. In the very nature of things this need not and can not be exact. The city can neither calculate in advance the license fees nor the expense of policing, etc., and, therefore, every presumption will be indulged in favor of the validity of such ordinances and that the sum required is a license fee. The facts in this and the Sullivan case are so similar that the decision there practically concludes this issue. It appears that the probable expense of the ordinance would be at least $2500 and that before there was any regulation there were about sixty Ford cars in operation as jitneys. These were five-passenger cars coming under the $50 license. If as many qualified under an ordinance they resist as ran without regulation there would only be an annual license fund of $3000; but in the very nature of things, where the facts show that many drivers were reckless and incompetent, it is not probable that all these could or

should qualify and pay the license, so that the city's fund would prob-
ably be less than its expense account.   In the case of Ex parte Denny,
59 Texas Crim. Rep., 579, Judge Ramsey has very accurately laid down
the rule above quoted; and the earlier cases of Brown v. Galveston and
Ex parte Gregory, above cited, sustain the fees in those cases ranging
from $2.50 to $12 on the old hack as licenses and not a tax.   Now it
is but a matter of common knowledge that these now ancient means of
locomotion were as different in their burden and servitude on the high-
ways, from the jitney that darts like an aeroplane everywhere and all
over the streets, as the license there charged differs from the license
named in this ordinance.   Mr. Black, the author of the great work on
intoxicating liquors, in his article in Cyc., volume 23, page 72, says:
"The amount which a municipal corporation may charge as a license
fee is not limited to the mere expense of issuing the license but may
include the cost of municipal supervision of the business, and be such
as to place a reasonable restriction upon the number of saloons and
the character and responsibility of the licensees."   In the case of Tele-
phone Co. v. Philadelphia, 190 U. S., 160, Judge Brewer said:   "In
the nature of things it is impossible for the license to have exact rela-
tion to the expenses and so the municipality is at liberty to make the
charge large enough to cover any reasonable anticipated expenses.   It is
authorized to make such charges in advance and need not wait until the
end of the period for which the license is granted.   It may not act
arbitrarily or unreasonably, but the risk may rightfully be cast upon
the licensee and the charge can not be avoided because it subsequently
appears it was somewhat in excess of the expenses of the supervision."

It is next claimed that the ordinance is an unreasonable exercise of
arbitrary power because in section 5 thereof it is provided that "the
city council may grant such application as filed, or may modify and
grant same as modified, in its discretion."   As observed in the first part
of this argument this is a power reserved to the discretion of the council,
but one that under the law would be held to be a sound discretion and
subject to review for its unreasonable exercise.   The portions of the
ordinance that follow in the same section limit and exemplify the cir-
cumstances under which this discretion could and should be exercised
to such cases as where the automobile is found on inspection to be
unsafe, or the schedule is not one calculated to give the best service, or
where the territory selected has already been properly supplied with jitneys
or where too many permits on the same route would unduly congest
traffic.   These are all certainly reasons that are both reasonable and
proper for the council to consider in regulating traffic on the streets
and it does not appear that the ordinance grants any unreasonable or
arbitrary power.   It must at all times be kept in mind that the public
have the primary right and that the jitney is plying a private business
on the public streets and the council is charged with a duty commen-
surate with its powers.

PRENDERGAST, Presiding Judge.—In vacation Mr. Bogle applied to one of the judges of this court for a writ of habeas corpus alleging that he was illegally restrained of his liberty by the chief of police of the City of Austin under a capias issued by the Corporation Court on a complaint filed therein August 21, 1915, charging him with that day operating a jitney on one of the public streets of the city without having a license, in violation of the ordinance making it an offense to do so and seeking his discharge from said claimed illegal arrest and detention. The writ was granted and the cause set for hearing before this court in term time.

The relator, Bogle, contends that said ordinance is unconstitutional, invalid and void on various grounds.

The attacked ordinance was enacted July 6, 1915, and on its face clearly appears to be regulatory only in all of its provisions and as a whole. Long before its enactment the city had in force another *permit* ordinance requiring every person running any automobile on its public streets to apply to and get from its clerk a permit to do so, and requiring the payment of a fee of 50 cents therefor, and that the number of his machine be properly placed thereon. Mr. Bogle had complied with that ordinance.

The city also had another *drivers'* ordinance, in effect, requiring every person who engaged in the business of carrying passengers for hire in any automobile within its limits, in addition to said permit, to get a driver's license from it and, when granted, to pay the city tax collector a fee of $2 therefor. Mr. Bogle had also complied with that ordinance.

It is agreed herein that about 1800 persons had taken out said permits, and that 95 of these had taken out said $2 driver's license, but that no person had applied for license under said jitney ordinance, and that Mr. Bogle had in no way complied therewith, and had no license thereunder.

It is also agreed that there was "a further class of vehicles" permitted to operate in carrying persons in the city under its ordinance designated as "any hack, . . . omnibus, . . . or other vehicle of any name whatever," carrying persons for hire, and that all such "have designated stands and run only on special calls and are not held out as running over any special route, and they charge a higher fare than jitneys." That all these are required to pay only said $2 license fee, and no bond is required of them. That all automobiles permitted to operate in the city, whether private cars, service cars having designated stands, or jitneys, are subject to the same traffic ordinances except such special provisions as are in said jitney ordinance relating to jitneys alone. That Mr. Bogle on the date charged in the complaint against him operated a five-passenger Ford automobile in the city as a jitney running on a route having definite termini of less than thirty-five blocks, which automobile operated by him would clearly be a jitney as defined in section 1 of the attacked ordinance. This ordinance makes it an offense to thus operate a jitney without license, and it was for that only Mr. Bogle was arrested and held in custody by the chief of police.

It is further agreed that there was a street car system operating in the city as a carrier of passengers under a franchise; that it carries passengers and gives transfers anywhere on its lines for five cents fare. It is not required to take out license nor give bond. It is required and pays the city $1 per mile occupation tax, and the same amount to the county and double that to the State. Its franchise and the city ordinances require it to pave its tracks and one foot additional on each side thereof wherever the city paves and to maintain the same space on all other streets where its tracks are laid. It has spent alone for paving in the city over $300,000, and its annual paving is about $30,000. It pays the city $4900 ad valorem tax and one-half that sum to the State and county annually. Its gross receipts annual tax to the State is $1955, and its Federal income tax is $611 annually. Its total annual tax for the space of each passenger is $58.76.

The charter of the City of Austin was granted by the Legislature, approved February 3, 1909, and by a provision therein the courts are required to take judicial knowledge thereof. (Special Laws of 1909, pp. 8-45.) It provides that the mayor and four councilmen shall be known and designated as the city council and have all legislative, executive and judicial functions or powers granted.

Among other provisions of the charter and powers given the city council are these:

Article XI, section 1. "The city council shall be vested *with the power and charged with the duty* of adopting all laws and ordinances not inconsistent with the Constitution and laws of the State of Texas, touching every subject matter and subject within the purview of the local self-government conferred by this Act upon the citizens of the City of Austin."

Article XIV, section 38. ". . . To make and regulate stands for vehicles at said depots and other public places."

Article XV, section 1. "The city council shall have power, subject to the restrictions herein contained, to make all rules, regulations and ordinances which may be necessary and proper for carrying into effect the powers specified herein."

Article XV, section 14. ". . . The council may enact any ordinance not in conflict with the penal laws of the State."

Article XII, section 1. "The city council shall have exclusive control over and regulation of all streets, alleys, sidewalks and highways, and the public squares within the corporate limits of the city, and shall have power (subdiv. h) to regulate the use of the same. . . ."

Article LIV. "The city council shall have power by ordinance (sec. 10) to license and regulate hacks, carriages, omnibuses, wagons and drays, and to fix the rate to be charged for the carriage of persons and for the wagonage, cartage, and drayage of property."

Section 32. ". . . To regulate the speed and handling of automobiles."

Under these powers and authority, we think, unquestionably, the city had the power and authority to enact and enforce any and all reasonable

ordinances, which it deemed necessary and proper, to regulate the handling of automobiles and the use of the streets by persons owning or operating the same in the carriage of passengers for hire. A jitney is an automobile, both in fact and so agreed herein and as specially defined by section 1 of said ordinance. In fact, as we understand, appellant concedes that the city council had power and authority to pass all reasonable ordinances regulating the jitney and the operation thereof on the streets of the city.

However, the first ground of his attack on said jitney ordinance is substantially this: That section 1 of said ordinance, when considered in connection with other ordinances, and the testimony, violates section 3, article 1, of our State Constitution and the Fourteenth Amendment of the Constitution of the United States in that it discriminates between the rights of the same class and places a greater burden upon one than another of the same class, and that whether the amount charged be a tax or license fee.

In the recent case of Ex parte Sullivan, 77 Texas Crim. Rep., 72, we discussed an ordinance of the City of Fort Worth, Texas, of which the ordinance attacked herein is substantially and practically the same, and therein held, as we do in this case, that the said ordinance violates neither our State Constitution nor the Constitution of the United States in this particular. What we said in the Sullivan case on that subject specially applies to this case. We think there can be no question but that the jitney as defined in the ordinance herein and as operated by Mr. Bogle is a class within itself, separate and distinct from both the street car system and other automobiles or vehicles which have stands as described above. In addition to the Sullivan case and authorities therein cited, we cite Ex parte Cardinal, 150 Pac. Rep. (Cal.), 348. By the ordinance all jitneys are treated exactly alike, and neither within that class is treated in any way whatever different from another.

He next attacks sections 9, 10 and 11 of said jitney ordinance requiring a bond, claiming that it is beyond the power of the city, and its charter confers no right, either express or implied, to create a cause of action in behalf of individuals, strangers to the licensee or licensor; or to provide a remedy for such or to insure or indemnify the city for damage or loss unless the same is of such a nature as to render the city liable either by statutory or common law; and by the terms of the ordinance and conditions of the required bond it affirmatively appears that the damage or loss sought to be guarded against is not of this character.

These sections of the ordinance, in effect, as a prerequisite for a license to operate a jitney, require that for each jitney the owner, etc., shall procure and file with the city an indemnity bond or policy of insurance in the sum of $5000, conditioned that the licensee shall pay any judgment of court finally rendered against him, etc., to the extent of $2500 on account of injuries to or death of any person or injury to the property of another, and to the extent of $5000 for like injuries

occurring in one accident to more than one person, caused by the neg-
ligence of such licensee, etc., and further conditioned to hold the city
harmless from any and all claims, etc., resulting to it from the granting
of such license. This bond can be made by either a surety company
authorized to do business in this State or by personal security.

Neither these sections nor the ordinance as a whole, as we under-
stand it, in any way creates, or attempts to create, in behalf of any
person any liability against the licensee or his bondsmen, but it merely
provides as one of the reasonable regulations of the licensee that he shall
provide by such bond or indemnity a means to satisfy the loss to such
one as may be damaged by him finally rendered by a court. It in no
way prescribes any contingency under which the licensee should be
liable to any person for any negligence whatever committed by him or
other act by him. The city would have no right to create that kind
of cause of action; and, as stated, it does not attempt to do so.

It is agreed herein that the City of San Antonio, Texas, had an
ordinance regulating jitneys, wherein it required as a prerequisite to a
license that the jitney owner should execute a bond in the sum of
$10,000, with the conditions thereof somewhat like the conditions of
the bond of the ordinance herein attacked; and that also the City of
Fort Worth, Texas, had a like ordinance requiring a bond in the sum
of $2500 with somewhat of the same conditions; that in the City of
San Antonio, under the ordinance of that city, ninety-one such bonds
as there required had been given, and under the ordinance of the City
of Fort Worth eighty-nine bonds as there required had been given.

In the Sullivan case, supra, we held that the bond required therein
was a proper regulation. We likewise hold in this case that the bond
required herein is a reasonable regulation, not void nor unconstitutional
on any ground, and is a proper regulation as shown in this case in the
City of Austin. In addition to the authorities cited on this point in
the Sullivan case, we now cite the case of Ex parte Bell, 24 Texas Crim.
App., 428; Green v. San Antonio, 178 S. W. Rep., 6; Ex parte Cardinal
supra.

In this connection, and others as well, it was further agreed herein
that prior to the passage of the jitney ordinance attacked there were
about sixty jitneys running in the city. Some of them had inexperi-
enced or reckless drivers, and few of them had any financial respon-
sibility, except some owned the Ford car operated. These jitneys
traversed the most traveled streets of the city, and largely confined
their traffic to the paved or best graded or graveled streets and prac-
tically paralleled all the street railway lines, and in going their usual
route all, or about all, of them traversed certain mentioned streets,
which are the principal streets of the city and in the most congested
centers of ordinary traffic and tended to greatly congest the traffic of
said streets. That during the sixty days prior to the passage of said
ordinance there were a number of accidents due to the jitneys. That
the city council, in view of the traffic conditions brought about by the
advent of the jitney and of the accidents due to their presence and

their menace to the general safety of the public, deemed that there was an imperative and urgent necessity for the passage of said jitney ordinance.

It is further agreed herein that the jitney traffic in the city is a business done, carried on and operated solely upon the public streets and thoroughfares of the city and is largely confined to the paved streets and best graded and graveled streets; and that the jitney is a new and hazardous kind of passenger traffic, and the danger to individual accident and injury is greater, and that the number of accidents in proportion to the number of passengers carried and injuries has, in fact, been greater in this line of passenger traffic than in any other commonly used.

It was further agreed that, by reason of the new and hazardous nature of the jitney service, very few surety or indemnity companies would undertake such security until the class, character and nature of the service have been reduced to a system (that it was not meant thereby that thereafter either of said bonds could or could not be given under said jitney ordinance); and that a personal bond could ordinarily be given only by a careful driver known to his sureties to be temperate, cautious and reliable; that the said bonds given in the cities of San Antonio and Fort Worth were made by an indemnity company. It was further agreed that application was made in behalf of the Austin jitneys to certain named indemnity companies without success and that a certain other company would write a policy on autos carrying passengers for hire, but would not write a policy under the ordinance attacked.

The next ground of attack is of section 7 of said ordinance, which prescribes a license fee of $50 per annum for each jitney with a seating capacity of five or less, including the driver, and of $75 for a seating capacity of not more than seven but more than five, including the driver, and of $100 for a seating capacity of more than seven persons, including the driver, claiming that these fees are not license fees but an evasion of the law and, in fact, a tax for revenue for city purposes and not as a police regulation.

So far as the relator is concerned, he is in no position to attack said section of the ordinance for the amount of the latter two fees, because it is conclusively shown that he comes within the $50 class only, and we do not pass upon those features of that section prescribing the $75 and $100 amount of license fees.

On this point, in addition to the agreed facts above recited, is this further agreement: that the carrying out of said jitney ordinance will require the printing of blanks and stationery for licenses, applications, bonds and such other matters as are named in the ordinance, and will require more clerical labor, all at an expense to the city that can not now be estimated; and that the policing of the ordinance will require two, or possibly three, extra policemen at a salary of $90 each per month, including a motorcycle man and cost of the motorcycle, all at an additional expense of probably $2500 a year, if the same number of jitneys were in operation; and that in fixing the amount of said license

fees the council did not expect the sum realized therefrom to more than pay the expenses of policing and enforcing said ordinance and did not expect to or contemplate the realizing of any revenue to the city over and above the additional expense caused by the proper enforcement of said ordinance.

We think that this demonstrates that the said $50 license fee was in truth and in fact a license fee only and not a tax to provide an extra revenue and that this section of the ordinance is unquestionably valid. Ex parte Sullivan,. supra, and authorities there cited.

That in the next attack on the ordinance he claims that, as a whole, it is unreasonable and clothes the city with arbitrary power to grant or refuse a license though the fees are paid and all the requirements thereof complied with by an applicant for a license.

This question was also discussed and passed upon in the Sullivan case, supra. We see no necessity of further discussing it here. The attacked ordinance herein is in no essential particular different from the Fort Worth ordinance passed upon in the Sullivan case. The relator is not in a position to attack the ordinance on that ground anyway, for it is conclusively shown that he has in no way attempted to procure a license and been refused on any ground. However, we might say that, if even he was in a position to attack the ordinance on this ground, we see nothing in it but a reasonable and proper regulation, and we see nothing in it which would authorize or justify this court to hold the ordinance, or any provision of it, void on that ground.

His next attack on the ordinance is his claim that the difficulty of complying with its requirements practically amounts to a prohibition; and that the amount of the fees required to be complied with before the bond can be given and the terms and amount of the bond are requirements which can not be complied with.

The relator's contention on this point can not be sustained. The whole agreed facts indicate that, if he is a proper person to operate a jitney under said ordinance, he may reasonably comply therewith, and that its provisions do not amount to a prohibition. The burden is on him to show what he claims and not on the State or city to show otherwise. In the agreed facts as a whole we think it is shown that he can reasonably comply therewith, and, hence, the ordinance is not void on this ground.

His last contention is that the arbitrary power preceding the issuance of license and the power reserved by the city to cancel it and throw him out of business at any time discourages the investment necessary to go into business and tends to, and does, prevent competition and results in building up a monopoly in behalf of the street car company.

We think it unnecessary to discuss this general attack of the ordinance. We see nothing in it that would sustain the relator's contention. On the contrary, we see from it only the proper and reasonable regulation of the business and the proper requisites of persons only who should be authorized by the city to operate jitneys on its streets. It may be that some persons would experience some difficulty in com-

plying with the ordinance, but no more so than any other like hazardous and dangerous business.

We have carefully investigated this ordinance and the relator's attack of it and the questions raised by him and reviewed the Sullivan case, supra, and the authorities therein cited, and have reached the conclusion that there is nothing in the ordinance herein attacked that would in any way legally permit or authorize this court to hold it invalid. On the contrary, it is our opinion that the said ordinance, in the particular attacked wherein relator is in position to attack it, is valid and constitutional, under the agreed statement of facts on file.

It is, therefore, ordered that the relator be remanded to the custody of the city marshal.

*Relator remanded to custody.*

DAVIDSON, JUDGE (dissenting).—I can not concur. I wrote fairly fully in the Sullivan case my views of disagreement. I may write in this case later.