## PIERCE *v.* SOMERSET RAILWAY.

ERROR TO THE SUPREME JUDICIAL COURT OF THE STATE OF MAINE.

No. 12.   Argued October 11, 12, 1898. — Decided October 31, 1898.

*Eustis* v. *Bolles*, 150 U. S. 361, affirmed and followed to the points:

(1) That to give this court jurisdiction of a writ of error to a state court, it must appear affirmatively, not only that a Federal question was presented for decision by the state court, but that its decision was necessary to the determination of the cause, and that it was decided adversely to the party claiming a right under the Federal laws or Constitution, or that the judgment, as rendered, could not have been given without deciding it;

(2) That where the record discloses that, if a question has been raised and decided adversely to a party claiming the benefit of a provision of the Constitution or laws of the United States, another question, not Federal, has been also raised and decided against such party, and the decision of the latter question is sufficient, notwithstanding the Federal question, to sustain the judgment, this court will not review the judgment.

THE case is stated in the opinion.

*Mr. D. D. Stewart* for plaintiffs in error.   *Mr. H. B. Cleaves* was with him on the brief.

*Mr. Edmund F. Webb* and *Mr. Josiah H. Drummond* for

defendants in error. *Mr. Joseph W. Symonds* was with them on the brief.

Mr. Justice Peckham delivered the opinion of the court.

This is a writ of error directed to the Supreme Judicial Court of the State of Maine, for the purpose of reviewing a judgment of that court in favor of the defendant in error, who was plaintiff below. 88 Maine, 86–100. The facts necessary to an understanding of the case are as follows:

The Somerset Railroad Company was organized in 1871, pursuant to an act of the legislature of the State of Maine, for the purpose of building and operating a railroad between Oakland, in the county of Kennebec, and Solon, in the county of Somerset, in that State. In order to obtain the money to build its road, the company, on the first day of July, 1871, executed a mortgage to three trustees, covering its railroad and franchises and all its real estate and personal property then possessed by it or to be thereafter acquired. By the terms of the mortgage the trustees were to hold in trust for the holders of the bonds of the railroad company, to be issued by it, payable as therein mentioned. The company thereupon issued and sold its bonds, secured by the mortgage, to the amount of $450,000, with proper coupons for interest attached, payable semi-annually on the first days of January and July in each year, at the rate of seven per cent, the principal of the bonds becoming due on the first of July, 1891. The proceeds of the sale of these bonds were applied to the building, equipping and operating of the road from Oakland to North Anson, a station between Oakland and the proposed terminus of the road at Solon. In 1876 the road had been completed as far as the village of Anson, twenty-five miles from Oakland, and it was opened and its cars commenced running in that year between those points. The company continued to so operate its road until September, 1883. It had, however, become insolvent some time prior to April 1, 1883, and at that time its coupons for interest on the bonds secured by the above-mentioned mortgage had been unpaid for more

than three years.   At the time when this mortgage was given corporations could be formed by the holders of bonds secured by a railroad mortgage in the manner provided for by the statute.   Chap. 51, Rev. Stat. Maine, 1871.   In 1878, seven years after the execution of the mortgage, the provision for the formation of corporations by the holders of bonds was extended so as to include the case of railroad corporations where the principal of the bonds should have remained overdue for the space of three years, and by an act of March 6, 1883, the provision was still further extended so as to apply to the case in which no interest had been paid thereon for more than three years.

By virtue of the provisions of the Revised Statutes of 1871, as amended and extended by the statutes of 1878 and 1883 (both statutes as will be seen being subsequent to the execution of the mortgage), the holders of bonds of the Somerset Railroad Company, following the method provided by those statutes, on the 15th day of August, 1883 formed a new corporation under the name of the Somerset Railway.   The capital stock of this new corporation was $736,648.76, made up of the principal of $450,000 of the unpaid outstanding bonds and $286,648.76 of interest thereon up to the 15th of August, 1883.   This was in accordance with the provisions of the statute that the new company should issue the capital stock to the holders of the bonds, secured by the mortgage, in the proportion of one share of stock for each one hundred dollars' worth of bonds and interest.   On the 1st of September, 1883, the Somerset Railway took possession of the railroad from Oakland to Anson (which was as far as it had then been completed), and of all the other property embraced in the mortgage, and it has ever since held and operated the same. Its capital stock was divided into shares of one hundred dollars each to the amount of the bonds and overdue coupons as the law provided.   The stockholders of the old company had previously on the 13th of July, 1883, at their annual meeting, voted that the bondholders should organize a new corporation under the statutes of the State, and take possession of the railroad, and at the same meeting voted to surrender possession of the road to the new corporation, the Somerset Railway.

The holders of a very large majority of these bonds, including some held by the parties in whose interest the plaintiffs in error now act, participated in the formation of this corporation, but the holders of all the bonds did not so participate, a majority being sufficient under the statute for the regular formation of the corporation. Bonds largely exceeding a majority of those which were issued under the mortgage were surrendered to the Somerset Railway and are now held by it, and the stock issued therefor, the amount being at the time the suit herein was instituted $339,400, and the amount of bonds not surrendered was $110,600, not counting overdue coupons.

From the time the new company took possession of the railroad it has continued to operate it as far as it was then completed, and it has also extended the same some sixteen miles, and as extended it has continued to operate it.

To obtain the funds necessary for the completion of the sixteen miles of extension the new company, under what is claimed to be due authority of law, issued its bonds on the 1st day of July, 1887, to the amount of $225,000, payable in twenty years from their date, and to secure payment of the same mortgaged its entire railroad from Oakland to Bingham, forty-one miles. These bonds were sold by the company and the proceeds applied towards the completion of the road. The mortgage given by the Somerset Railroad Company in 1871 included the roadbed from Oakland to the terminus of the road in Solon. The mortgage given by the new company in 1887 embraced the railroad so far as it had been constructed by the old company, as well as the sixteen miles constructed by the new company after it took possession of the road. The giving of this mortgage in 1887 was a matter of public notoriety, well known to the trustees of the original mortgage, and no objection was made in behalf of any one; on the contrary, the trustees stood by and saw this mortgage of 1887 given and the bonds sold to innocent parties and the money expended in extending the railroad sixteen miles, and it was not until more than five years afterwards, when the road had been built and completed and was in operation to Bingham, that the trustees took action.

In December, 1892, the trustees in the mortgage of 1871 commenced two actions at law, one in each of two counties in which the railroad was situated, in which actions the president of the new corporation, its superintendent, treasurer, accountant and various station agents and conductors were made parties defendant because they were in possession of the road, and the plaintiffs, trustees, claimed to recover from the defendants, as disseizors, the possession of the railroad, and from the defendants, as individuals, the sum of $180,000 as mesne profits.

The ground upon which the trustees based their action was that the new company was never legally organized ; that by the terms of the mortgage the trustees alone could take proceedings to foreclose the mortgage, and that the acts of the legislature passed subsequently to the execution of the mortgage, and under which the new, company was formed, could and did have no validity as against the contract rights of the plaintiffs, secured to them by the law as it stood at the time of the execution of the mortgage of 1871.

Upon these facts and many others which are not now material to be stated, the new company commenced this suit in equity against the trustees in the mortgage of 1871, who were plaintiffs in the two actions at law, to enjoin the further prosecution of those actions and for other relief as mentioned in their complaint. In this suit the new company alleged (among other things) that the trustees in the mortgage of 1871 and their successors had stood by, allowed and encouraged the formation of the new company and the surrendering of the bonds and the issuing of the stock in lieu thereof, and also the execution of the mortgage by the new company to secure the payment of $225,000 borrowed for the extension of its road ; also the contracting of debts and the expending of large amounts of money in useful repairs and improvements, and that all this was done without the trustees making known to the new company that they or those whom they represented as bondholders had any claim or cause of action against the new company, and the complainants therefore averred that the trustees and those whom they represented had been guilty of such delay and laches as to estop them

from denying the validity of the new corporation or its title or possession. The new company also alleged the entire validity of the proceeding resulting in its formation.

Answering that complaint, the trustees denied that the new company was ever established under any law of Maine; they denied that it ever had any legal organization or any legal existence; they denied that the mortgage of July 1, 1871, had ever been legally foreclosed, and they alleged that neither the original board of trustees named in the mortgage, nor their successors, had ever taken any steps towards a legal foreclosure or had ever determined that there had been a breach of the conditions of that mortgage, and that the attempted foreclosure of that mortgage was in violation of the contract rights secured to the trustees thereunder at the time of its execution, and the attempted foreclosure of that mortgage was therefore utterly void; they denied that any statute of the State had been enacted, or could be enacted, which would or could deprive the bondholders or trustees of the rights secured to them by virtue of their contract of July 1, 1871, and the laws of the State in force when the contract was made. They alleged that the contract rights of all the parties to the mortgage of July 1, 1871, were fixed by the laws in force when the mortgage was executed, and that no law of the State of Maine then existing authorized the organization of the new corporation in the manner attempted herein, and that the laws then existing formed a part of the mortgage contract and provided a mode by which the mortgage could be legally foreclosed and a new company formed for the benefit of all the bondholders, and they alleged that the rights of the bondholders who who took no part in the formation of the new company were fixed by the mortgage contract and could not be affected in any way, except by payment. Various other matters were set up in their answer which it is not now necessary to mention.

The Supreme Judicial Court of Maine upon these issues held: " (1) That the new company was legally organized; that the various acts of the legislature of Maine, passed subsequently to the execution of the mortgage, did not impair the obligations of the contract contained in the mortgage,

but simply afforded a more convenient and quicker remedy for a violation of the agreement and for the foreclosure of the mortgage than existed at the time of its execution"; (2) the court also stated and held as follows: "The new corporation took possession of the mortgaged property on the first day of September, 1883, and has ever since held it and operated the railroad. This action was authorized by the statute, consented to by the Somerset Railroad Company, the mortgagor, actively proposed and aided by one at least of the trustees, and ever since acquiesced in by all the trustees. It is too late for the trustees or dissenting bondholders now to object to technical irregularities, if any exist, especially as the Somerset Railway has since extended the railroad from North Anson to Bingham, a distance of about sixteen miles; built a branch railroad of one mile in length of great importance to the productiveness of the main line, placed a mortgage upon the road for $225,000 to make these extensions and other improvements, and in other ways materially changed the condition and relations of all parties interested in the road. Their long acquiescence, without objection, coupled with the changed conditions and relations resulting from the possession and management of the property by the Somerset Railway, estops them from now questioning the legality of the organization of the new corporation."

The court further held that, under the statutes of Maine, the bondholders who had refused to take stock in the new company still retained the same rights under their bonds as the holders of the stock in the new company which had been given in exchange for bonds, and that if any bondholder declined ultimately to exchange his bonds for stock he could not be compelled to do so, and that the net earnings of the company when distributed in the form of dividends or otherwise must be distributed to its stockholders, and to the holders of any unexchanged bonds in equal proportions; that if the holders of unexchanged bonds chose to take stock they could do so at any time or they might retain their present possessions and receive their share of the net earnings *pro rata* with the stockholders.

It is thus seen that there were two questions determined by the state court: One related to the validity of the statutes passed subsequently to the execution of the mortgage, the court holding them valid, and that they did not impair the obligation of the contract contained in the mortgage. That is a Federal question. The other related to the defence of estoppel on account of laches and acquiescence, which is not a Federal question. Either is sufficient upon which to base and sustain the judgment of the state court. In such case a writ of error to the state court cannot be sustained. *Eustis* v. *Bolles*, 150 U. S. 361; *Rutland Railroad* v. *Central Vermont Railroad*, 159 U. S. 630; *Seneca Nation* v. *Christy*, 162 U. S. 283.

A person may by his acts or omission to act waive a right which he might otherwise have under the Constitution of the United States as well as under a statute, and the question whether he has or has not lost such right by his failure to act or by his action, is not a Federal one. .

In the above case of *Eustis* v. *Bolles*, 150 U. S. 361, 368, the state court held that by accepting his dividend under the insolvency proceedings Eustis waived his legal right to claim that the discharge obtained under the subsequent laws impaired the obligation of a contract. This court held that whether that view of the case was sound or not it was not a Federal question, and therefore not within the province of this court to inquire about.

Mr. Justice Shiras, in delivering the opinion of the court in that case, said:

"The defendants in the trial court depended on a discharge obtained by them under regular proceedings under the insolvency statutes of Massachusetts. This defence the plaintiffs met by alleging that the statutes under which the defendants had procured their discharge had been enacted after the promissory note sued on had been executed and delivered, and that to give effect to a discharge obtained under such subsequent laws would impair the obligation of a contract, within the meaning of the Constitution of the United States. Upon such a state of facts it is plain that a Federal question, decisive of the case, was presented, and that if the judgment of

the Supreme Judicial Court of Massachusetts adjudged that question adversely to the plaintiffs it would be the duty of this court to consider the soundness of such a judgment.

" The record, however, further discloses that William T. Eustis, represented in this court by his executors, had accepted and receipted for the money which had been awarded him, as his portion, under the insolvency proceedings, and that the court below, conceding that his cause of action could not be taken away from him, without his consent, by proceedings under statutes of insolvency passed subsequently to the vesting of his rights, held that the action of Eustis, in so accepting and receipting for his dividend in the insolvency proceedings, was a waiver of his right to object to the validity of the insolvency statutes, and that, accordingly, the defendants were entitled to the judgment.

" The view of the court was that, when the composition was confirmed, Eustis was put to his election whether he would avail himself of the composition offer, or would reject it and rely upon his right to enforce his debt against his debtors notwithstanding their discharge.

" In its discussion of this question the court below cited and claimed to follow the decision of this court in the case of *Clay* v. *Smith*, 3 Pet. 411, where it was held that the plaintiff, by proving his debt and taking a dividend under the bankrupt laws of Louisiana, waived his right to object that the law did not constitutionally apply to his debt, he being a creditor residing in another State. But in deciding that it was competent for Eustis to waive his legal rights, and that as accepting his dividend under the insolvency proceedings was such a waiver, the court below did not decide a Federal question. Whether that view of the case was sound or not, it is not for us to inquire. It was broad enough, in itself, to support the final judgment, without reference to the Federal question."

Eustis had a right which was protected by the Constitution of the United States. This right, the state court held, he had waived by his action, and this court said whether the state court was right or not, was not a Federal question.

In *Seneca Nation* v. *Christy*, 162 U. S. 283, it was held by

the state court that even if there were a right of recovery on the part of the plaintiffs in error because the grant of 1826 was in contravention of the Constitution of the United States (which the court held was not the case), yet that such recovery was barred by the New York statute of limitations. This court held that as the judgment of the state court could be maintained upon the latter ground, it was without jurisdiction because the decision of the state court upon that ground involved no Federal question.

In this case there being two distinct grounds upon which the judgment of the state court was based, each of which is sufficient, and one of which involves no Federal question, we must, upon the authority of the cases above cited, hold that this court is without jurisdiction, and the writ of error must be

*Dismissed.*

MR. JUSTICE HARLAN and MR. JUSTICE WHITE were of opinion that the decree should be affirmed.