AUTO TRANSIT CO. et al. v. CITY OF FT. WORTH et al.　(No. 8304.) *

(Court of Civil Appeals of Texas. Ft. Worth. Nov. 20, 1915. On Motion for Rehearing, Jan. 15, 1916.)

1. APPEAL AND ERROR ☞719—ASSIGNMENTS OF ERROR—NECESSITY.

On appeal from an order declining to continue a temporary injunction, appellants are not required to file briefs containing formal assignments of error.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 2968–2982, 3490; Dec. Dig. ☞719.]

2. INJUNCTION ☞85—SUBJECTS OF RELIEF—ENFORCEMENT OF ORDINANCES.

While, as a general rule, an injunction will not be granted to stay criminal proceedings, an injunction will be granted to prevent the threatened enforcement of a criminal ordinance, the validity of which is involved to avoid a multiplicity of suits, and irreparable injury, there being no adequate remedy at law where repeated prosecutions will seriously impair or destroy property rights.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. §§ 155, 156; Dec. Dig. ☞85.]

3. COURTS ☞1—"JURISDICTION."

The "jurisdiction" of a court is the power to consider and decide one way or the other as the law may require.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 1–4, 6–9, 91–106; Dec. Dig. ☞1.

For other definitions, see Words and Phrases, First and Second Series, Jurisdiction.]

4. COURTS ☞207 — JURISDICTION — COURT OF CIVIL APPEALS.

Where property rights are involved in the attempted enforcement of penal ordinances alleged to be invalid because of statutory and constitutional grounds, the Court of Civil Appeals, though a court of exclusive civil jurisdiction, may properly exercise its jurisdiction to inquire into the validity of the ordinance and to grant relief by injunction if it should determine the ordinance to be invalid.

[Ed. Note.—For other cases, see Courts, Dec. Dig. ☞207.]

5. CARRIERS ☞2—CONSTITUTIONAL LAW ☞205—CLASS LEGISLATION—REGULATION OF JITNEY OR "MOTOR BUS."

An ordinance regulating the operation of motor busses, defining a "motor bus" as any automobile or trackless motor vehicle carrying passengers for hire, and held out or announced as operating or running over a particular route

---

☞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes
*Application for writ of error pending in Supreme Court.

to a paticular point, or within any designated territory, requiring a license to be procured, imposing a license fee of $10, and requiring the execution of a surety bond conditioned for the payment of damages for injuries or death caused by the negligence or willful act of the owner or operator, does not violate Const. art. 1, § 3, providing that all freemen have equal rights, and that no man or set of men is entitled to exclusive, separate public emoluments or privileges, except in consideration of public services, though no surety bond is required of street railways, taxicabs, or rent cars, and no license fee is required for the operation of the street railway, while a license fee of only $3 is imposed on taxicabs and other rent cars.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 4, 5; Dec. Dig. ☞2; Constitutional Law, Cent. Dig. §§ 591–624; Dec. Dig. ☞205.]

6. CONSTITUTIONAL LAW ☞136—IMPAIRING OBLIGATIONS OF CONTRACT—REVOCATION OF LICENSES.

A city ordinance imposing more burdensome conditions on the operation of jitneys or motor busses than were imposed by a prior ordinance with which parties operating motor busses had complied did not violate Const. art. 1, § 16, prohibiting the enactment of any law impairing the obligation of contracts where it provided that those who had paid a license fee under the prior ordinance might have a license granted them under the new ordinance for the unexpired term, or that in case the licensee should elect to discontinue the operation of his motor bus the portion of the fee for the unexpired term would be refunded to him.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 299, 300, 343, 362; Dec. Dig. ☞136.]

7. CONSTITUTIONAL LAW ☞297 — EMINENT DOMAIN ☞2—TAKING PROPERTY—PRIVILEGES AND IMMUNITIES.

A city ordinance requiring parties operating jitneys or motor busses to procure a license for which a license fee of $10 was imposed, and to furnish a bond conditioned for the payment of damages for injuries or death caused by their vehicles, and authorizing the revocation or suspension of the license upon conviction for a violation of any provision of the ordinance, did not violate Const. art. 1, § 17, providing that no person's property shall be taken, damaged, or destroyed or applied to public use without adequate compensation being made, or section 19, providing that no citizen shall be deprived of life, liberty, property, privileges, or immunities, or in any manner disfranchised, except by due course of law of the land.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 832–834; Dec. Dig. ☞297; Eminent Domain, Cent. Dig. §§ 3–12; Dec. Dig. ☞2.]

8. LICENSES ☞7—"OCCUPATION TAX"—STATUTORY PROVISIONS.

Such ordinance did not violate Const. art. 8, § 2, providing that all occupation taxes shall be equal and uniform upon the same class of subjects within the limits of the authority levying the tax, as the license fee was not in the nature of an occupation tax, and, moreover, the burdens placed upon different individuals engaged in the operation of motor busses were the same, and it is only when a discrimination is shown as between members of the same class that this constitutional guaranty may be invoked.

[Ed. Note.—For other cases, see Licenses, Cent. Dig. §§ 7–15, 19; Dec. Dig. ☞7.

For other definitions, see Words and Phrases, First and Second Series, Occupation Tax.]

9. MONOPOLIES ☞4 — VALIDITY OF ORDINANCES.

Such ordinance did not violate Const. art. 1, § 26, providing that a monopoly shall never be allowed, as it disclosed no intent or purpose to create a monopoly of the carrying of passengers in favor of a street car company, taxicabs, and other rent vehicles, and the court would not be authorized to speculate or surmise as to the existence of such motives on the part of the municipal legislative body, or that such a result would probably flow from the enactment of the ordinance.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 3; Dec. Dig. ☞4.]

10. CARRIERS ☞2—USE OF STREETS—REGULATION OF JITNEYS.

That parties operating jitneys or motor busses are not in a position to comply with an ordinance requiring as a condition to the granting of a license for the operation of motor busses the execution of a bond conditioned for the payment of damages for injuries or death caused by their vehicles, and will therefore be required to abandon the operation of their motor busses, does not in itself establish the unreasonableness or invalidity of the ordinance.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 4, 5; Dec. Dig. ☞2.]

11. CARRIERS ☞2—USE OF STREETS—REGULATION OF JITNEYS.

That parties operating jitneys or motor busses will suffer a pecuniary injury from the enforcement of an ordinance regulating the operation of such vehicles does not even tend to establish the invalidity of the ordinance.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 4, 5; Dec. Dig. ☞2.]

12. MUNICIPAL CORPORATIONS ☞703 — USE OF STREETS—REGULATION OF JITNEYS.

The Ft. Worth charter gives the board of commissioners exclusive power and control of the streets, and authorizes the board to regulate the speed of locomotives, trains, street cars, vehicles, and animals, abate nuisances, prohibit and restrain or regulate the use of vehicles, automobiles, or other conveyances, regulate and fix the fares, tolls, and charges of all street railways, public carriages, hacks, and vehicles, provide for license fees, police tax, and surveillance of drivers and owners of vehicles, and vests the board with general police powers to enact and enforce ordinances necessary to protect health, life, and property, and to prevent and summarily abate and remove nuisances and enforce the good government, order, and security of the city and its inhabitants, and to have and enjoy the general police powers of a city. Such board adopted an ordinance requiring persons desiring to operate motor busses, defined as including trackless motor vehicles, carrying passengers for hire, and operating and running over a particular route, or to a particular point, or within designated territory, to file an application for a license, giving certain specified information as to the vehicle intended to be operated, its proposed driver, route, etc., and providing that the board might for reasons therein designated refuse a license; that no license should be granted except on condition that a bond conditioned for the payment of damages for injuries or death should be furnished; that individual sureties thereon should furnish specified proof of their insolvency; and that the board might require a new or additional bond. It further promulgated rules for the operation of such vehicles, the loading and unloading of passengers, the number of passengers, the hours each day in which the motor bus must be operated, the speed of operation, etc., and made violations thereof a misdemeanor punishable by a fine not exceeding $200, and authorized the

---

☞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

revocation or suspension of the license upon conviction for violations. *Held*, that this was authorized under the general police powers with which the board was vested by the charter, as well as the other charter provisions mentioned.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 1509–1513; Dec. Dig. ☞703.]

On Motion for Rehearing.

13. MUNICIPAL CORPORATIONS ☞703—REGULATION OF JITNEYS OR MOTOR BUSSES.

An ordinance regulating the operation of jitneys or motor busses, and requiring as a condition to the granting of a license for the operation of any such vehicle the execution of a bond conditioned for the payment of damages for injuries or death caused by the operation thereof, was not discriminatory or invalid, though there was no similar requirement as to the operation of taxicabs or rent cars, or individuals operating their own cars, not for hire, as the operation of jitneys on crowded streets is a business peculiarly dangerous to the public, and the duty of care on the part of operators is more important than the performance of such duty in the case of one only occasionally or infrequently driving over such streets, and the danger therefrom is more imminent and frequent, and a city, in the exercise of its police power, may properly require a further guaranty than it does of others that operators of such vehicles will avoid acts of negligence and respond for any damage inflicted.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 1509–1513; Dec. Dig. ☞703.]

Appeal from District Court, Tarrant County; . Marvin H. Brown, Judge.

Suit by the Auto Transit Company and others against the City of Ft. Worth and others. From an order refusing to continue a temporary injunction, plaintiffs appeal. Affirmed.

Ike A. Wynn, of Ft. Worth, for appellants. T. A. Altman, of Ft. Worth, for appellees.

BUCK, J.   This was a proceeding by the Auto Transit Company, a corporation domiciled in Ft. Worth, Tarrant county, Tex., and J. C. Walton, a resident of said county, professedly on behalf of themselves and 60 other "motor bus" or "jitney" owners and operators against the city of Ft. Worth, represented by its mayor and four commissioners, seeking to enjoin the enforcement of Ordinance No. 448, and as amended by Ordinance No. 470, theretofore passed by the said board of commissioners, regulating the operation of said motor busses, or "jitneys," in common parlance, on the streets of said city. Both ordinances were attached to and made a part of the petition. Petitioners alleged that they, and those for whom they sued, had complied with Ordinance No. 448 when it became effective, and had since been operating thereunder. Petitioners also alleged that Ordinance No. 442, theretofore passed by the city of Ft. Worth, provided that every owner of a motor-driven vehicle should register the same and pay a license number tax to the assessor and collector of $1 per car, and that they, and those for whom they sued, had

complied with the said ordinance also. It was further alleged that the Auto Transit company owned and operated 32 motor busses, and had invested in its cars about $17,500, and the plaintiff Walton about $500. Others for whom suit was brought were also alleged to have invested approximately the sum of $500 each; and it was averred that the effect of Ordinance No. 470 would be to drive the motor bus or "jitney" out of competition with the street railway company operating in Ft. Worth, and to give a monopoly to said street railway company of the transportation of passengers within said city; that the city of Ft. Worth embraces about 17½ square miles, and has a population of about 100,000; that it has many miles of streets which are traversed by the street cars, and by far the greater portion of its inhabitants do not live adjacent to street car lines, and that the "jitney" has been for some time a necessary public conveyance and utility, and is an economical and efficient development of local transportation necessary for the convenience and welfare of the great majority of the inhabitants of said city; that there are now in operation in said city about 150 "jitneys," which carry many thousands of passengers each day. It was further alleged that petitioners were unable to comply with the provisions of Ordinance No. 470 requiring a bond in the sum of $2,500, payable to the mayor of the city of Ft. Worth, and executed by the person in whose name the license is sought as principal, and a solvent surety corporation, incorporated under the laws of the state of Texas, or with permit to do business in this state, conditioned that the principal shall pay all legal damages for injuries to property or person of any one, including injuries resulting in death on account of the negligence or willful act of the owner or operator of such motor bus, etc., inasmuch as the fee for said bond was unreasonable and even prohibitory, such companies charging from $200 to $250 for each said bond executed. Further allegations were made as to the terms, requirements, and conditions of said Ordinance No. 470 with reference to the operation of motor busses or "jitneys," as contained in subdivision "g" of section 5 of said ordinance, which petitioners alleged were discriminatory, and constituted an unnecessary and unreasonable regulation beyond the police power of the city, and violated the Constitutions of the United States and the state of Texas. It was further alleged that, inasmuch as it is practically impossible for petitioners to comply with the provisions of said ordinance, they would be greatly injured in their property and property rights, and would be deprived of the privileges and immunities guaranteed to them by the laws of the land, if such ordinance should be enforced, and that the city of Ft. Worth, through its said board

of commissioners, was threatening and attempting to enforce said ordinance, and that, unless it was restrained, it would subject plaintiffs, their agents and employés, and those in whose behalf they brought suit, in case they did not comply with the provisions of said ordinance, which compliance was alleged to be impossible, to innumerable arrests and prosecutions and much vexation, harassment, and oppression.

Accompanying, and in support of, said petition was an affidavit of E. M. Rogers, president of the Auto Transit Company, to the effect that said company had been incorporated for the purpose of owning, maintaining, and operating automobiles and other vehicles designed for the purpose of carrying passengers, freight, express, and mail in the city of Ft. Worth; that said company had paid its franchise tax for 1915; that the "jitneys" or "motor busses" in the city of Ft. Worth numbered about 150, and carried approximately 30,000 passengers each day for a five-cent fare; that there were a great many "taxicabs" and "rent cars" operating in Ft. Worth, and said "rent cars" were five-passenger Ford automobiles, and practically identical with those operated by plaintiffs, and such cars were operated over the streets in the same manner as plaintiffs' "jitneys," with the same attendant risks and dangers; that said taxicabs and rent cars charged many times as much for carrying a passenger as plaintiffs charged; that the Northern Texas Traction Company is a private corporation operating street cars over certain streets in the city of Ft. Worth for a fare of five cents; that an automobile is not a dangerous machine, or an unsafe means of conveyance, and that a careless or reckless driver makes the operation of an automobile just as hazardous when he is operating a "private car" or "rent car" as when he is driving a "jitney" or "motor bus"; that the "jitneys" constituted a great convenience to the inhabitants of the city of Ft. Worth, many of whom choosing and preferring this mode of travel. Affiant further averred the compliance by his company with the provisions of Ordinances Nos. 442 and 448, and the payment by it of various sums of money for registration of license fees and the purchase of indemnity contracts, as provided by said ordinances, that it was impossible to make personal bonds, as provided in the alternative in Ordinance No. 470, and was wholly impossible to comply with the provisions requiring bonds by surety companies, and that it would cost said plaintiff company $6,600 to procure the bonds executed by a surety company.

Also there were affidavits from E. W. Scott and Adams B. Vera containing practically the same averments. Also an affidavit signed by some 11 persons alleged to be citizens of Ft. Worth, to the effect that the Northern Texas Traction Company owns and operates a street railway system in the city of Ft. Worth, and has about 77 miles of trackage,

and runs about 200 cars over the streets of said city, and that there are about 100 other carriers of passengers for hire in the way of taxicabs, omnibuses, etc., running over said streets, and that none of these mentioned carriers are required to carry passenger insurance as provided in said ordinances applicable to the "jitneys."

A temporary restraining order was granted by the trial court, and upon hearing on June 26, 1915, the court declined to continue said temporary injunction, which expired on the day of hearing, and denied plaintiffs' prayer so to do, to which order of the court the plaintiffs excepted and gave notice of appeal.

[1] Plaintiffs have not filed in this court briefs containing formal assignments of error, and under the law they are not required to do so (Holbein v. De La Garza, 126 S. W. 42; F. W. & D. C. Ry. v. Craig, 176 S. W. 827), but have contented themselves with filing a memorandum of authorities. But we have had the benefit of an able and exhaustive brief furnished by appellee.

On the threshold of the consideration of this cause we are met with two questions affecting the jurisdiction of this court, to wit: First, whether an injunction will lie to restrain the enforcement of a criminal statute or ordinance; and, second, even though it be admitted that in certain instances such relief may be granted, may the authority to grant such relief be exercised by a court of exclusive civil jurisdiction, or has the authority been delegated to courts exercising criminal jurisdiction?

[2, 3] First. As has been often said, it is a general rule that an injunction will not be granted to stay criminal proceedings, but, as we understand the authorities, this does not mean that an injunction will not lie to prevent prosecution under a criminal ordinance, or to prevent the threatened enforcement of such criminal ordinance, where the validity of the ordinance is involved. It seems clear from the authorities that in the latter case an injunction will be granted to avoid a multiplicity of suits, to avoid irreparable injury, and that there is no adequate remedy at law where repeated prosecutions will seriously impair or destroy property rights. A court of equity may entertain jurisdiction of a suit to enjoin the enforcement of an alleged invalid statute, for the absence of lawful power to impose the restrictions of the statute may result in irreparable loss to the party concerned; for "jurisdiction" is the power to consider and decide one way or the other, as the law may require. Nolen v. Reichman (D. C.) 225 Fed. 812. In the case of Dobbins v. Los Angeles, 195 U. S. 223, 25 Sup. Ct. 18, 49 L. Ed. 169, the United States Supreme Court uses this language:

"It is well settled that, where property rights will be destroyed, unlawful interference by criminal proceedings under a void law or ordinance may be reached and controlled by a decree of a court of equity."

In line with and in support of these two authorities may be cited the cases of Ex parte Warfield, 40 Tex. Cr. R. 413, 50 S. W. 933, 76 Am. St. Rep. 724; City of Houston v. Richter, 157 S. W. 189; Dibrell v. City of Coleman, 172 S. W. 550, writ of error denied November 17, 1915; City of Austin v. Austin Cemetery Ass'n, 87 Tex. 330, 28 S. W. 529, 47 Am. St. Rep. 114; Sumner v. Crawford. 91 Tex. 129, 41 S. W. 994; Greene v. City of San Antonio, 178 S. W. 6; Booth v. City of Dallas, 179 S. W. 301; Sylvester Coal Co. v. City of St. Louis, 130 Mo. 323, 32 S. W. 649, 51 Am. St. Rep. 566. In the last-cited case the Supreme Court of Missouri uses the following language:

"It is contended that, though it be conceded that the ordinances are invalid. the plaintiffs are not entitled to injunctive relief on the facts stated, for the reason that they have an adequate remedy at law. But is the remedy at law adequate? It must be remembered that the injury complained of here is continuous. The ordinances are continuous, and plaintiffs' business is continuous, and, under the ordinances, for each wagonload of coal sold and delivered in violation of the restrictive provisions thereof, the plaintiffs each become subject to an action in the municipal courts of the city for such violation. The fact that in each of such suits the plaintiffs might plead successfully the invalidity of the ordinances as a defense thereto does not give them an adequate remedy. They are entitled to be protected from the expense, vexation, and annoyance of such a multiplicity of suits. in consequence of their continuance of a legitimate business, except upon compliance with the condition or ordinances which it is alleged are and may be utterly void."

High on Injunctions (3d Ed.) p. 12, says:

"The prevention of vexatious litigation and of a multiplicity of suits constitutes a favorite ground for the exercise of the jurisdiction of equity by way of injunction."

Therefore we hold that question No. 1 must be answered in the affirmative.

[4] Second. We think also from the authorities cited, and from the allegations in the petition, to the effect that property rights are involved by the attempted enforcement of ordinances alleged to be invalid because of statutory and constitutional grounds, that this court may properly exercise its jurisdiction: First, to inquire into the validity of the ordinance attacked; and, second, in case it should determine said ordinances to be invalid, to grant the relief prayed for in plaintiffs' petition.

We now come to the consideration of the validity vel non of Ordinances Nos. 448 and 470. It would seem from the authorities that, since appellants have taken out a license under Ordinance No. 448, and have accepted the benefits thereof and operated thereunder, it cannot attack the constitutionality or validity thereof. Young v. City of Colorado, 174 S. W. 986; Musco v. United Surety Co., 196 N. Y. 459, 90 N. E. 171, 134 Am. St. Rep. 851; City of New York v. Manhattan Ry., 143 N. Y. 1, 37 N. E. 494; Pierce v. Somerset Ry., 171 U. S. 641, 19 Sup. Ct. 64, 43 L. Ed. 316.

182 S.W.—44

In the case of Pierce v. Somerset Ry. Co., supra, the United States Supreme Court said:

"A person may by his acts or omission to act waive a right which he might otherwise have under the Constitution of the United States as well as under a statute."

In the case of Musco v. United Surety Co., supra, the surety company became a surety for one Ferrara on a bond given under and by virtue of an act of the New York Legislature regulating the taking of deposits by persons, firms, or corporations engaged in the selling of steamship or railroad tickets, etc. Suit was brought by plaintiff against defendant surety company under said act, and from an order overruling a demurrer to the complaint it appealed to the Court of Appeals for New York urging the unconstitutionality of the statute. The court says:

"The appellant, as surety, having executed an undertaking in accordance with the provisions of said act with and for a person engaged in receiving deposits as aforesaid, in this action brought in behalf of persons who made deposits with the principal after such undertaking was executed, which have not been accounted for, defends on the ground that said act is unconstitutional. * * * We are of the opinion that these contentions cannot prevail; that, in the first place, the appellant is debarred from making them."

In Young v. City of Colorado, supra, this court, speaking through Associate Justice Dunklin, used the following language:

"It is also well settled that a person may by his act, or omission to act, waive a right which he might otherwise have under the provisions of the Constitution. 8 Cyc. 791, 792."

In the case of Mellen Lumber Co. v. Industrial Commission of Wisconsin, 154 Wis. 114, 142 N. W. 187, Ann. Cas. 1915B, 997, the Supreme Court of Wisconsin held that appellant, by electing to come under the Workmen's Compensation Act of that state, was thereby precluded from objecting to its constitutionality, saying:

"The argument that the provision under discussion is violative of the 'due process of law' clause of the federal Constitution cannot prevail. It was optional with the appellant to come in under the Compensation Act or to stay out. It elected to take the former course. It accepted the provisions of the act as they were, the burdens as well as the benefits, and so long as it remains under the law it must take the statute as it finds it"—citing a number of cases.

But, inasmuch as the main contention of the appellants is predicated upon the provisions of Ordinance No. 470, which amended sections 1, 2, and 5 of Ordinance No. 448, we are probably not required to so declare the law as set forth in the authorities cited.

Said Ordinance No. 470 is quite lengthy and therefore we will not attempt to set it out in full, but only mention the provisions which seem to be directly involved in the consideration of the questions presented by plaintiffs' petition. In section 1, subd. "b," it defines the words "motor bus" as meaning and including "any automobile, automobile truck, or trackless motor vehicle engaged in the business of carrying passengers for hire

within the city limits of the city of Ft. Worth, which is held out or announced by sign, voice, writing, device, or advertisement to operate or run, or which is intended to be operated or run, over a particular street or route or to any particular or designated point, or between particular points, or to within any designated territory, district or zone."

Section 2 requires any person desiring to operate such "motor bus" within Ft. Worth to file with the city secretary thereof an application in writing, giving certain information, including the type of the motor car or motor bus, the horse power thereof, the factory number, the county license number, the seating capacity, the name and age of each person to be in the immediate charge thereof as driver, whether such proposed driver uses drugs, intoxicating liquors, or had been convicted of violating any traffic ordinance of the city of Ft. Worth, the termini between which such motor bus is to be operated, the street or streets over which it is to be run, and further provides that upon the filing of such application for license it shall be referred to the city commission, which board may for sufficient reasons designated in the ordinance refuse to grant said application and issue the license thereunder.

Subdivision "g" of said section provides that no license shall be granted to any person to operate a motor bus within the limits of the city of Ft. Worth except upon the condition that the applicant for such license enter into a bond conditioned as pleaded by plaintiff and hereinbefore set out. Said subdivision further requires that individuals offered as sureties comply with certain requirements of proof establishing their solvency, that the board of commissioners may require a new bond or additional bond from any licensee whenever the bond approved, or surety thereon, is by the board deemed insufficient, or when such bond shall have been decreased in amount by recovery thereon. The license issued under the provisions of this act is required to designate the route or termini along which or between which the said motor bus is to operate.

Section 5 provides the rules of operation of a motor bus and penalties for the violation thereof, and, among other things, prohibits such motor bus from remaining standing upon any street for the purpose of loading or unloading passengers, except it be brought as near as possible to the right-hand curb of said street; from driving or operating a motor bus without the city license number being displayed on the rear of said bus. It requires, further, that a sign or painting showing both the destination and the route of same be prominently displayed on and attached to said motor bus. It prohibits persons from riding on the running boards or fenders, or to occupy any other place thereon outside of the body thereof while such motor bus is in operation, and limits the number of passengers which may ride in the front with the driver, and limits and fixes the number of hours each day in which said motor bus must be operated, except as to Sundays, and in case of accidents, breakdowns, etc., fixes the speed at 12 miles per hour in the business section of Ft. Worth, and 18 miles per hour in the residence section of Ft. Worth at which motor bus may be operated, prohibits the running of said car between sundown and sunup without lights, and prohibits racing with any other motor bus or driving rapidly to pass one in order to be first to any prospective passenger or any one waiting for another motor bus or other conveyance, etc. It further provides that each and every day's violation of any provisions of the ordinance shall constitute a separate offense, and that one so violating shall be guilty of a misdemeanor, and shall be punished by fine not exceeding $200, and that in case of conviction of the owner or operator under such ordinance the commissioner of fire and police shall report the same to the commissioners, together with his recommendation, and that the commissioners shall consider and act upon said recommendation, and may revoke or suspend such license if they deem it proper.

Under chapter 5, section 1, of the city's charter, the exclusive power and control of the streets is given to the board of commissioners, and under section 2 of said chapter power is vested in said board, by ordinance or otherwise, to regulate within the limits of said city the "speed of locomotives, trains, street cars, vehicles and animals." By Chapter 9, section 3, the power to abate all nuisances is lodged in the commissioners, and under section 18 the authority to prohibit and restrain or regulate the use of vehicles, bicycles, automobiles, or any other conveyance. Under chapter 11, section 8, the authority is vested in the commissioners to regulate and fix the fares, tolls, and charges of all street railways, public carriages, hacks, and vehicles of every kind; under section 13 of said chapter to provide for license fees, police tax, and surveillance of drivers and owners of vehicles of every kind; and under section 4 of the same chapter said board is vested with general police powers "to enact and enforce ordinances necessary to protect the health, life and property, and to prevent and summarily abate and remove nuisances of all kinds and description, and to preserve and enforce the good government, order, and security of said city, and of its inhabitants, and have and enjoy general police powers of a city.

There are other provisions of the charter which might be mentioned as affecting the authority of the city sought to be exercised in this instance, but sufficient has been noted for the purposes of this opinion.

[5] We do not think because the fee for the operation of a motor bus is placed at

$10, while the license fee for taxicabs and other rent cars is only $3, and there is no license fee required for the operation of the street railway mentioned, and, further, that said ordinance requires the execution of a surety bond in the sum and terms mentioned, and none is required either for the taxicabs and other rents cars or for the street railway, make said ordinances obnoxious to the provisions of article 1, § 3, of the state Constitution, which reads as follows:

"All freemen, when they form a social compact, have equal rights, and no man, or set of men, is entitled to exclusive separate public emoluments, or privileges, but in consideration of public services."

Nor is it the fact that said ordinance attempts to define as a separate class motor busses or "jitney" cars. As has been said by our Supreme Court in the case of Supreme Lodge United Benev. Ass'n v. Johnson, 98 Tex. 5, 81 S. W. 18:

"The Legislature may classify persons, organizations, and corporations according to their business, and may apply different rules to those which belong to different classes." Campbell v. Cook, 86 Tex. 630, 26 S. W. 486, 40 Am. St. Rep. 878; Insurance Co. v. Chowning, 86 Tex. 654, 26 S. W. 982, 24 L. R. A. 504; Marchant v. Railway Co., 153 U. S. 389, 14 Sup. Ct. 894, 38 L. Ed. 751; Insurance Co. v. Mettler, 185 U. S. 325, 22 Sup. Ct. 662, 46 L. Ed. 922.

As has been said in the case of Nolen v. Reichman, supra:

"The presumption is always in favor of the validity of legislation; and, if there could exist a state of facts justifying the classification or restriction complained of, the courts will assume that it existed."

We can readily understand that greater danger may be caused to the public by the operation of numerous motor busses continuously throughout the day, over and along crowded streets filled with congested traffic, and without limitation as to the street or streets, or parts thereof, over which they may operate, than from the operation of taxicabs and other rent cars, which are required to occupy a fixed place or stand when not in operation, and which, when transporting passengers, do not ordinarily run over the streets on which the heaviest traffic exists, or from the operation of a street railway along a fixed track and on steel rails. As is said in Nolen v. Reichman, supra:

"Furthermore, a substantial distinction between the property of the owner of a street railway and that of the owner of a 'jitney' should not escape attention. The former consists of a fixed plant, including rolling stock, which is operative only along tracks provided for the purpose, while that of the latter is fugitive in character, since it is operative through its own power upon any portion of the surface of an ordinary highway. It results that the street railway property is in its nature an indemnity against the consequences of negligence, and so is at least an equivalent for the bond of indemnity which is here resisted by the owner of the 'jitney.' * * *

"It may well have been that the Legislature had in mind, when it enacted the statute in question, that those engaging in the business which the act sought to regulate operated vehicles susceptible of becoming dangerous to the public by the manner of their operation; that they had no fixed track upon which to run, and were at liberty to move over the entire surface of the street; that they had no schedule; that pedestrians had no way of knowing when and where to expect them; that they increased the danger to persons using the street, whether as pedestrians or while boarding or leaving street cars or other vehicles; that they stopped at street crossings, or along the curb between street crossings, to receive and discharge passengers; that very often the driver owns the machine, or at least an equity in it; that many of them are financially irresponsible; that the patrons of such vehicles are composed of men, women, and children; that the vehicles, in the hands of careless drivers, might rush through crowded streets at a dangerous rate of speed, probably without any financial responsibility to their patrons or others upon whom damage might be inflicted by such machines, because of the negligence of the operators. * * *

"There is another distinction that should be noted. It concerns the taxicab. While the 'jitney' and the taxicab are physically the same, yet the services they perform materially differ. The service of the one is designed to accommodate persons traveling along distinct routes and at a rate of fare common to all; but the service of the other is intended for the accommodation of persons whose destinations involve varying distances and lines of travel and presumably at varying prices. The two kinds of service would signify substantial difference in numbers of vehicles needed to meet the respective demands; and so the dangers attending the operation of the 'jitney' presumably would materially exceed those arising in the taxicab service."

[6] Nor do we think that the ordinance discussed is inhibited by the provision contained in section 16, art. 1, of the state Constitution, which prohibits the enactment of any law impairing the obligation of contracts, as claimed by appellants in connection with their plea that they had complied with the requirements of Ordinances Nos. 442 and 448, and that, in effect, the enforcement of the provisions of Ordinance No. 470 would be an abrogation of the terms of the contract entered into between the city and appellants. It is stated in 8 Cyc. 938:

"As a license authorizing a person to practice a profession, or to carry on a particular business, is not a contract which vests a right, but merely the grant of a privilege, such a license is not protected by the constitutional prohibition as to the impairment of the obligation of contracts."

In Doyle v. Insurance Co., 94 U. S. 535, 24 L. Ed. 148, the United States Supreme Court says:

"The correlative power to revoke or recall a permission is a necessary consequence of the main power. A mere license by a state is always revocable."

The application of this well-established principle certainly does not work any deprivation to the appellants, inasmuch as the ordinance provides that those who have paid a license fee under the prior ordinance may have a license granted them under this ordinance for the unexpired term, or, in case the licensee should elect to discontinue the operation of his motor bus, the portion of said fee for the unexpired term will be refunded to him.

[7] Nor do we think that the ordinance is in violation of section 17, art. 1, of the state Constitution, which provides, in part, that:

"No person's property shall be taken, damaged or destroyed for, or applied to, public use without adequate compensation being made," etc.

—as plaintiffs alleged in their petition.

Nor do we think that it is contrary to section 19, art. 1, of the state Constitution, which provides that:

"No citizen of this state shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by the due course of the law of the land."

This contention, raised by appellants in their petition, may most pertinently be directed to section 6 of said ordinance, which authorizes the board of commissioners, upon a showing that a licensee has been convicted of a violation of a provision of this ordinance, to revoke or suspend such license if it deem proper. It has been held that, where the authority to revoke a license is not given a municipality in its charter, and is not expressly authorized by ordinance, such revocation is not within the powers of the governing officers of such municipality (25 Cyc. 625), though the authority of revocation, it seems, may be presumed by virtue of the charter power to issue the license (Newson v. City of Galveston, 76 Tex. 559, 13 S. W. 368, 7 L. R. A. 797; City of Jacksonville v. Ledwith, 26 Fla. 163, 7 South. 885, 9 L. R. A. 69, 23 Am. St. Rep. 558, with notes thereunder).

But section 8 of Ordinance No. 448 contains the same provision as to the power of revocation or withdrawal of license as in section 6 of Ordinance No. 470. Plaintiffs had accepted such terms when they applied for license under the older ordinance; hence it would seem that they are not now in a position to complain. 25 Cyc. p. 626, subd. "c."

[8] Nor do we think that it can be successfully contended that the ordinance is in conflict with article 8, § 2, of the state Constitution, which provides that:

"All occupation taxes shall be equal and uniform upon the same class of subjects within the limits of the authority levying the tax," etc.

For, in the first place, the license fee therein provided is not in the nature of an occupation tax (Ex parte Sullivan, 178 S. W. 537; Hoefling & Son v. City of San Antonio, 85 Tex. 228, 20 S. W. 85, 16 L. R. A. 608); and, in the second place, it is not shown that there is any difference as to the license required of or in other burdens placed upon different individuals engaged in the operation of motor busses, and it is only when a discrimination is shown as between members of the same class that this constitutional guaranty may be invoked (State v. Railway, 100 Tex. 173, 97 S. W. 71; Texas Company v. Stephens, 100 Tex. 628, 103 S. W. 481).

[9] Nor do we think there is anything in the allegation that by the enforcement of said ordinance there will be the creation of a monopoly of the carrying of passengers in the city of Ft. Worth in favor of the street car company or of the taxicabs and other rent vehicles, and in this respect in violation of section 26, art. 1, of the Constitution. The ordinance itself does not disclose any such intent or purpose on the part of the board of commissioners of Ft. Worth, nor does it suggest such a result. In the absence of such a showing, we would not be authorized to indulge in speculation or surmise as to the existence of such motives on the part of the municipal legislative body, or that such result would probably flow from the enactment of said ordinance. It is held that the motive of a legislative body in enacting a law will not be inquired into by the courts. Soon Hing v. Crowley, 113 U. S. 703, 5 Sup. Ct. 730, 28 L. Ed. 1145; Shenandoah Lime Co. v. Mann, 115 Va. 865, 80 S. E. 753, Ann. Cas. 1915C, 973; Cooley on Constitutional Limitations (7th Ed.) 258; 36 Cyc. 1137.

[10, 11] Nor does the fact that the plaintiffs herein are not in a position to comply with the terms and provisions of the ordinance under discussion, of itself, establish the invalidity or unreasonableness of such ordinance. It is true that the provision requiring a surety bond may necessitate the incurrence of an expense which the plaintiffs may not be able to bear, and that therefore they will be required to abandon the operation of their motor busses, but that in itself does not establish the unreasonableness or invalidity of the ordinance. Nor does the fact that plaintiffs will suffer a pecuniary injury by reason of the enforcement of said ordinance even tend to establish the truth of the contention that the ordinance is invalid. As said by Mr. Justice Brewer in the N. Y. & N. E. R. Co. Cases, cited in Grainger v. Jockey Club, 148 Fed. 513, 78 C. C. A. 199, 8 Ann. Cas. 997:

"The truth is that the exercise of the police power often works pecuniary injury, but the settled rule of this court is that the mere fact of pecuniary injury does not warrant the overthrow of legislation of a police character."

In the Jacobson Case, 197 U. S. 11, 25 Sup. Ct. 358, 49 L. Ed. 643, Mr. Justice Harlan says:

"In every well-ordered society charged with the duty of conserving the safety of its members the rights of the individual in respect of his liberty may at times, under the pressure of great dangers, be subjected to such restraint, to be enforced by reasonable regulations, as the safety of the general public may demand."

In the Barbier Case, 113 U. S. 27, 5 Sup. Ct. 357, 28 L. Ed. 923, cited in the same opinion, Mr. Justice Field says:

"Though, in many respects, necessarily special in their character, they [statutory regulations] do not furnish just ground of complaint if they operate alike on all persons and property under the same circumstances and conditions. Class legislation, discriminating against some and favoring others, is prohibited, but legislation which, in carrying out a public purpose, is limited in its application, if within the sphere of its operation it affects alike all per-

sons similarly situated, is not within the amendment." Fourteenth Amendment, U. S. Constitution.

[12] In conclusion we desire to say that, so far as we have been able to determine, the ordinance in question was authorized under the general police powers with which the charter vested the board of commissioners, as well as other charter provisions hereinbefore mentioned, and that we cannot say that the ordinance should be held invalid on any of the grounds urged, or that it contains any unreasonable terms and conditions, or is discriminatory in its nature. Therefore we hold that the trial court did not err in denying the continuance of the injunction as prayed for, and the judgment of said court is hereby affirmed.

Affirmed.

### On Motion for Rehearing.

[13] Counsel for appellants has filed an able and vigorous motion for rehearing, and in it insistently urges that in our original opinion, as well as in the opinions of all the other courts passing upon the "jitney" ordinances, the courts have overlooked, or at least failed to discuss, a feature which he thinks renders said ordinances discriminatory. It is urged that in the requirement of a surety bond of the "jitneys" the city can only justify such a provision upon the ground that it will tend to make the "jitney" operators more careful, exercise greater diligence to avoid injury to the public, but that this duty—i. e., not to negligently or willfully injure any person upon the streets of the city—is a duty which is no more chargeable upon the "jitney" operator than upon the driver of a rent car or taxicab, or upon an individual who is not operating his car for hire; that the conditions, in this respect, under which the several classes of motor-propelled vehicles operate upon the streets are the same; that the same driver may during a part of the day operate the "jitney," and during another part of the day drive a private car or a rent car; that the public is no more subject to injury from the same driver's operation of a "jitney" in the forenoon than from his operation of a car other than the "jitney" in the afternoon; that his duty in this respect is no greater in the forenoon than in the afternoon; that the rule is that the same obligations or restrictions must be imposed upon all persons similarly conditioned in reference to the duty regulated. He cites in support of his contention the case of G., C. & S. F. Ry. Co. v. Ellis, 165 U. S. 150, 17 Sup. Ct. 255, 41 L. Ed. 667, a suit involving the validity of a Texas statute, passed April 5, 1889, providing that a plaintiff whose claim, under $50 for stock killed by a railway company, which had not been paid within 30 days, should be entitled, in a suit, and upon establishing his claim, to recover reasonable attorney's fees, not to exceed $10. The Texas Supreme Court had held this act valid, but the United States Supreme Court, in reversing our state court upon this feature, said in part as follows:

"Considered as such [as a whole], it is simply a statute imposing a penalty upon railroad corporations for a failure to pay certain debts. No individuals are thus punished, and no other corporations. The act singles out a certain class of debtors, and punishes them when for like delinquencies it punishes no others. They are not treated as other debtors, or equally with other debtors. * * * It is, of course, proper that every debtor should pay his debts, and there might be no impropriety in giving to every successful suitor attorney's fees. Such a provision would bear a reasonable relation to the delinquency of the debtor, and would certainly create no inequality of right or protection. But before a distinction can be made between debtors, and one be punished for a failure to pay his debts, while another is permitted to become in like manner delinquent without any punishment, there must be some difference in the obligation to pay, some reason why the duty of payment is more imperative in the one instance than in the other. * * * That such corporations may be classified for some purposes is unquestioned. The business in which they are engaged is of a peculiarly dangerous nature, and the Legislature, in the exercise of its police powers, may justly require many things to be done by them in order to secure life and property. Fencing of railroad tracks, use of safety couplers, and a multitude of other things easily suggest themselves. And any classification for the imposition of such special duties—duties arising out of the peculiar business in which they are engaged—is a just classification, and not one within the prohibition of the Fourteenth Amendment."

We do not believe our holding in the instant case and the holding of the other courts cited in "jitney" cases fails to measure up to the principle laid down in the Ellis Case. If we are correct in concluding from the facts submitted that the operation of the "jitney" on the crowded streets of a city is a business peculiarly dangerous to the public using the streets, then the fulfillment of the duty of care on the part of the operators is more important than the performance of such duty in the case of one only occasionally or infrequently driving a car over said streets. The danger is more imminent and frequent, and might be said to be continuous. Therefore, in the exercise of its police powers, a city may require of the "jitney" operators a further guaranty than it does of others that he will avoid acts of negligence, and that, in case of an accident, certainly more likely to occur than in the case of operators of other motor vehicles mentioned, he will be in a position to respond for the damage inflicted.

In St. John v. New York, 201 U. S. 633, 26 Sup. Ct. 554, 50 L. Ed. 896, 5 Ann. Cas. 909, a case in which the court was dealing with the question of alleged discrimination between producing and nonproducing vendors of such article, it being contended that such law was discriminatory, for the reason that nonproducing vendors might not exempt themselves from actions or penalties for violations of certain subdivisions of said act by showing that the milk sold or offered for sale by them was in the same condition as when it left the herd of the producer, a

privilege accorded to producing vendors, the United States Supreme Court, after stating that the purpose of the law was to secure to the population milk containing a certain standard of purity and strength, and to disclose other milk unclean, impure, unwholesome, etc., continued:

"It is not contended that such purpose is not within the power of the state, but it is contended that the power is not exercised on all alike who stand in the same relation to the purpose, and quite dramatic illustrations are used to show discrimination. A picture is exhibited of producing and nonproducing vendors selling milk side by side; the latter, it may be, a purchaser from the former; the act of one permitted; the act of the other prohibited or penalized. If we could look no farther than the mere act of selling, the injustice of the law might be demonstrated, but something more must be considered. Not only the final purpose of the law must be considered, but the means of its administration—the ways it may be defeated. Legislation, to be practical and efficient, must regard this special purpose, as well as the ultimate purpose."

We feel that the language of the Supreme Court, as above quoted, is sufficient answer to appellants' contention.

It might be well to state that, though the "jitney" legislation is of recent origin, yet the question of the validity of ordinances similar to the one under consideration has reached the courts of last resort, both of civil and of criminal jurisdiction, in many of the states, and, in no case, so far as we have found from our examination, has the court sustained the contention of invalidity.

In addition to the cases cited in our original opinion we might cite City of Memphis v. State (Tenn.) 179 S. W. 631; Ex parte Bogle, 179 S. W. 1193, by the Texas Court of Criminal Appeals, decided November 3, 1915, not yet officially published; City of New Orleans v. Le Blanc, 70 South. 212, decided by the Louisiana Supreme Court November 29, 1915. In these cases ordinances with similar or more onerous provisions have been upheld.

Believing that in our original opinion we correctly disposed of all the issues involved, the motion for rehearing is overruled.